COURT OF APPEALS OF VIRGINIA


Present:  Judges Baker, Bray and Senior Judge Hodges
Argues at Norfolk, Virginia


WALTER REED CONVALESCENT CENTER/
 VIRGINIA HEALTH SERVICES, INC.
                                        OPINION BY
v.   Record No. 1063-96-1          JUDGE WILLIAM H. HODGES
                                       MARCH 11, 1997
   JEANICE ANNE REESE


        FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Linda M. Ziegler (Crews & Hancock, PLC, on
            briefs), for appellant.

            John H. Klein (Matthew H. Kraft; Rutter &
            Montagna, L.L.P., on brief), for appellee.


     Walter Reed Convalescent Center/Virginia Health Services,

Inc. (employer) appeals from a decision of the Workers'

Compensation Commission (commission) awarding Jeanice Anne Reese

(claimant) compensation for various periods of temporary partial

and temporary total disability.  Employer contends that the

commission erred in finding that (1) selective employment

procured by employer for claimant exceeded her residual work

capacity; and (2) claimant's termination from selective

employment was not caused by her wrongful acts so as to justify a

forfeiture of workers' compensation benefits pursuant to the rule

enunciated in Chesapeake & Potomac Telephone Co. v. Murphy, 12

Va. App. 633, 406 S.E.2d 190, aff'd en banc, 13 Va. App. 304, 411

S.E.2d 444 (1991).

     We find no credible evidence in the record to support the

commission's finding that the errors and omissions made by

claimant during the performance of her job as a ward clerk, which resulted in her termination from that job, were causally related to her injury and its residual effects. Rather, the credible evidence in the record clearly established that claimant's termination from selective employment was due solely to her repeated negligent mistakes, which potentially placed employer's patients in jeopardy. Based upon this record, we hold that employer was justified in terminating claimant for cause. Accordingly, we reverse the commission's decision and remand for the commission to enter an award terminating claimant's disability benefits as of June 21, 1995.[1]

## BACKGROUND

On December 2, 1993, while working as a licensed practical nurse ("LPN") for employer, claimant sustained a compensable injury by accident to her right hand/wrist. On March 24, 1994, claimant came under the care of orthopedic surgeon, Dr. Jeffrey Moore, who diagnosed post-traumatic deQuervain's syndrome of the right wrist. On July 14, 1994, claimant underwent deQuervain's release surgery on her right wrist. On July 26, 1994, Dr. Moore released claimant to light-duty work with restrictions against lifting over ten pounds and repetitive use of her right hand.

---

[1] Employer also argues that the commission improperly relied upon claimant's written statement on review. This argument is without merit. The commission stated in its opinion that it would not consider claimant's written statement because it was not timely filed. There is nothing in the commission's opinion to indicate that it improperly considered the written statement.

2

In July 1994, claimant returned to work for employer as an LPN, with modified duties.  On September 15, 1994, employer reassigned claimant to a medication nurse job because of the injury-related problems she was having performing the LPN job and keeping up with the workload.  Claimant also had difficulty performing the medication nurse job due to her injury.  Therefore, in October 1994, employer reassigned claimant to a ward clerk job.  Claimant worked full-time in the ward clerk job from October 1994 until her termination on June 21, 1995.

On March 7, 1995, employer disciplined claimant for putting a physician's order in the wrong book, resulting in a patient going without medication.  Employer's Employee Counselling Forms, dated between May 10, 1995 and June 20, 1995, show that employer disciplined claimant numerous times for failing to complete forms, failing to transcribe orders, failing to pull computer copies of "POFs," placing a physician's order in the wrong book, erroneous transcriptions of forms or orders, placing an order on an order sheet which claimant knew did not belong on the sheet, failing to hand in the beauty shop list, failing to hang up door cards, and acting aloof and non-caring to a family member of a patient.  Although the Employee Counselling Forms contained space for claimant to explain her mistakes, she never reported that her mistakes or her failure to properly perform her job were due to pain from her injury or an inability to keep up with the workload.

On June 21, 1995, employer disciplined claimant for failing to transcribe a physician's orders to the medication administration record, causing a patient not to receive his medication and for failing to complete the monthly "POFs." The June 21, 1995 Employee Counselling Form indicated that claimant had been reprimanded for this same behavior on March 7, 1995, May 10, 1995, and May 18, 1995, respectively, and that claimant's behavior had not improved. Employer terminated claimant on June 21, 1995.

At the hearing, claimant testified that the ward clerk job required her to lift charts and write constantly. She stated that she could not keep up with the workload because she could not write for prolonged periods and had to use her left hand. She contended that pain caused by her injury slowed her work output and that she told her supervisor about these problems.

Fay Kellam, employer's Director of Nursing, testified that in April 1995, after working in the ward clerk job for approximately six months, claimant signed a ward clerk job description, making several amendments to the description, which employer accepted. These amendments reflected that claimant was unable to take vital signs and would stock supplies and purge records "as able." Kellam stated that claimant agreed to perform the other job duties, and, although she told claimant to ask for help if necessary, claimant did not ask for help. Kellam stated that claimant did not express concerns to her about not being

4

able to perform the ward clerk job duties because of the workload, because of the pain from her injury, or because she needed to take breaks. Kellam stated that claimant did not have trouble performing the ward clerk job, but simply failed to perform tasks or made errors. Kellam testified that claimant was terminated on June 21, 1995 because she repeatedly failed to transcribe physician's orders, causing patients not to receive medication or to receive the wrong medication.

The medical record reveals that on August 23, 1994, Dr. Moore reported that claimant continued to work in a light-duty capacity, but her wrist remained symptomatic. Dr. Moore continued claimant on light-duty with a restriction against repetitive or vigorous use of her right hand. On September 15, 1994, Dr. Moore noted improvement in claimant's symptoms, but kept her on restricted duty. On that same date, Dr. Moore signed a "Modified Duty Work Evaluation" form, indicating that claimant could lift up to five pounds and push or pull up to ten pounds. Dr. Moore placed no restrictions on claimant standing, sitting, or bending, but advised that claimant should avoid overuse and repetitive activities.

On October 12, 1994, Dr. Moore reported that claimant suffered from increased pain due to excessive use of her right hand. He opined that claimant was developing a reflex dystrophy of the right arm, and he recommended a sympathetic block. Dr. Moore stated that "[o]nce we control the pain I would not

necessarily limit her activities at work and I think that she should use her hand and arm as much as possible."  However, Dr. Moore stated that, "[i]n the meantime, would recommend curtailing her activities within her limits of discomfort."  On November 2, 1994, Dr. Moore noted claimant's continuing pain and her failure to obtain relief from the block.  Dr. Moore stressed the importance of the blocks to claimant to get the pain under control.  He did not change claimant's work status and encouraged her to use her hand as much as possible within the limits of her pain.  On December 7, 1994, Dr. Moore noted claimant's decision not to proceed with any further sympathetic blocks.  Having nothing further to offer claimant, Dr. Moore recommended claimant undergo an evaluation at the MCV Pain Management Center ("MCV").

On February 20, 1995, claimant began treatment at MCV with Dr. Amir Rafil.  On March 13, 1995, Dr. Rafil administered a block and prescribed physical therapy.  On April 12, 1995, Dr. Rafil prescribed a TENS unit for claimant.  On April 26, 1995, claimant reported a fifteen percent improvement to Dr. Rafil, and she told him that she continued to work full-time.  Dr. Rafil recommended that claimant continue to wear a wrist brace.[2]  On May 24, 1995, claimant reported a twenty percent improvement to Dr. Rafil, and she told him that her activity level had improved.

_____

[2]There is no evidence in the record establishing that claimant ever actually wore a wrist brace or that such a brace had any impact on claimant's ability to perform the ward clerk job.

6

Dr. Rafil noted that claimant suffered from only mild to moderate pain. On that date, Dr. Rafil opined that claimant had reached maximum medical improvement and recommended she continue using the TENS unit and the wrist brace. On June 12, 1995, Dr. Rafil reported a twenty percent improvement. He discharged claimant and recommended that she see Dr. Stewart for follow-up care. Dr. Rafil's records between February 1995 and June 1995 do not contain any notation that claimant reported difficulty performing the duties of the ward clerk job due to her injury.

The deputy commissioner relied upon the Employee Counselling Forms and Kellam's testimony to find that employer proved that claimant neglected the duties of the ward clerk job, noting that on several occasions she incorrectly transcribed a physician's orders or failed to transcribe a physician's orders. Based upon this evidence, the deputy commissioner found that employer was justified in terminating claimant's employment for cause on June 21, 1995, and therefore, claimant was not entitled to compensation benefits as long as she remained partially disabled.

On review, the commission modified the deputy commissioner's decision, finding that the deputy commissioner did not make the necessary factual determination of whether the duties of the ward clerk job fell within the claimant's residual capacity. The commission ruled that before it could apply the C & P Telephone v. Murphy forfeiture rule, it had to determine that the

light-duty job procured by employer was suitable to claimant's residual capacity. The commission found that the ward clerk job duties exceeded claimant's light-duty restrictions. Based on this ruling, the commission refused to apply the C & P Telephone v. Murphy forfeiture rule. Instead, the commission found that claimant's inability to perform the ward clerk job was caused by her injury, which resulted in her termination. The commission modified the deputy commissioner's decision by awarding claimant temporary total disability benefits beginning June 21, 1995 and continuing.

## I.

"Although the findings of the . . . Commission, if based on credible evidence, are conclusive and binding upon us, the Commission's findings of fact are not binding upon us when there is no credible evidence to support them. The question of sufficiency of the evidence then becomes one of law." Morris v. Badger Powhatan/Figgie Int'l, Inc., 3 Va. App. 276, 279, 348 S.E.2d 876, 877 (1986).

The commission found that the ward clerk job exceeded claimant's light-duty restrictions. However, the commission did not identify any specific restrictions violated by claimant's performance of the ward clerk job. The commission also failed to take into account that claimant worked for six months in the ward clerk job without difficulty, agreed to the amended job description in April 1995, and gave no indication at that time

8

that she could not perform the duties of the ward clerk job, as amended. Rather, the commission supported its finding by relying on claimant's testimony that she could not perform the ward clerk job and her physicians' suggestion that she wear a brace while working.

Based upon our review of the record, we find claimant's testimony inherently incredible and inconsistent with the medical records, the counselling forms, and Kellam's testimony. Absent claimant's testimony, no evidence established that the duties of the ward clerk job, as amended, fell outside of claimant's residual capacity. Accordingly, the commission erred in ruling that the ward clerk job was not suitable to claimant's residual capacity.

II.

In Eppling v. Schultz Dining Programs/Commonwealth of Virginia, 18 Va. App. 125, 442 S.E.2d 219 (1994), this Court set forth the law applicable to this case:

> When a disabled employee is discharged from selective employment, the "inquiry focuses on whether the claimant's benefits may continue in light of [her] dismissal." An employee's workers' compensation benefits will be permanently forfeited only when the employee's dismissal is "justified," the same as any other employee who forfeits her employment benefits when discharged for a "justified" reason.
>
> A "justified discharge . . . does not simply mean that the employer can identify or assign a reason attributable to the employee as the cause for his or her being discharged. Whether the reasons for the discharge is for "cause," or is "justified" for purposes of

9

> forfeiting benefits must be determined in the context of the purpose of the Act and whether the conduct is of such a nature that it warrants permanent forfeiture of those rights and benefits. "[T]he Commission . . . must be mindful of the purposes and goals of the" Act.

Id. at 128, 442 S.E.2d at 221. "[I]n order to work a forfeiture, the 'wage loss [must be] properly attributable to [the employee's] wrongful act . . . [for which t]he employee is responsible.'" Id. at 129, 442 S.E.2d at 222 (citation omitted). We find no case law to support the commission's holding that the employer must prove that the employee's wrongful act was intentional, willful, or deliberate in order to justify a termination for cause and a forfeiture of compensation benefits.[3]

The commission concluded that claimant's inability to perform her job due to her physical restrictions led to her termination. This finding is not supported by credible evidence. Claimant's testimony that she could not perform the ward clerk job during the spring and early summer of 1995 is inconsistent

---

[3]The commission ruled that in order to terminate a partially disabled employee's compensation benefits due to the employee's termination, the employer must prove that the employee's termination was caused by the employee's willful or deliberate misconduct at work. Richmond Cold Storage Co., Inc. v. Burton, 1 Va. App. 106, 111, 335 S.E.2d 847, 850 (1985). This standard applies to a proceeding before the Virginia Employment Commission to determine whether an employee has been discharged for misconduct so as to bar unemployment compensation benefits. We have never held that a "wrongful act" which does not necessarily rise to the level of "willful or deliberate" cannot constitute justification for a termination for cause from selective employment so as to cause a forfeiture of workers' compensation benefits.

10

with the medical records generated during this time period, which reflected that she continued to improve and was working full-time without apparent difficulty. Although claimant testified that she could not perform the ward clerk job because it required her to lift charts, no evidence in the record established that the charts weighed more than five pounds. In addition, the record does not contain any evidence of the percentage of time claimant spent writing on the job. The ward clerk job description contains many duties which did not require writing. Claimant agreed to accept the job description in April 1995, as modified by her, as evidenced by her signature. No evidence disputed Kellam's testimony that employer agreed to these modifications. Moreover, Kellam testified that claimant never told her that she was having difficulty performing the duties of the job due to pain caused by her injury. Kellam's testimony, unlike claimant's, is corroborated by the Employee Counselling Forms. Each Employee Counselling Form provided a space where claimant could have stated that her injury and disability prevented her from performing her job or caused her mistakes. However, she never reported that her injury prevented her from carrying out her duties or caused her to make errors. In fact, claimant never testified that her alleged inability to keep up with the workload due to her injury caused her to make mistakes.[4]

[4]The commission considered Dr. Stewart's July 11, 1995 Attending Physician's Report. However, Dr. Stewart generated this report after employer terminated claimant from her job, and therefore, it is not relevant to the issue of whether claimant

11

The Employee Counselling Forms clearly indicated that claimant repeatedly made errors in carrying out her job duties. These errors were not caused by her injury, but instead were caused by her incompetence and failure to follow properly established rules and procedures. Employer discharged claimant due to her repeated negligent errors, which claimant failed to correct and which potentially placed employer's patients in jeopardy. There is no evidence, other than claimant's after-the-fact rationalizations, indicating that her errors or omissions were caused by her wrist condition. Claimant had ample opportunity to include a written statement on the disciplinary notices to explain her mistakes, to tell her supervisors of her problems related to her injury, or to report such problems to her physicians. She did not do so.

In this case, the evidence established as a matter of law that claimant's wrongful acts, which jeopardized employer's patients, and not her injury or disability, caused her wage loss. Thus, this loss was not employer's responsibility. The evidence established that claimant's termination was unrelated to her injury and was due solely to her misconduct. The facts in this case are distinguishable from those in Eppling, where we held that the claimant's excessive absenteeism caused by a non-work-related injury beyond the employee's control was not the

could physically perform the ward clerk job prior to her termination.

12

type of wrongful act which, upon termination, justified a forfeiture of workers' compensation benefits.  <u>Id.</u> at 129-30, 422 S.E.2d at 222.  In <u>Eppling</u>, credible evidence proved that the claimant's absences were due to non-work related health problems.  <u>Id.</u>  In this case, credible evidence established that claimant's failure to properly perform her job was caused by her incompetence, not her injury.  No <u>credible</u> evidence showed that claimant's mistakes were caused by her injury or its residuals effects.

For these reasons, we reverse the commission's decision and remand for the commission to enter an award consistent with this opinion.

<u>Reversed and remanded.</u>