596 S.E.2d 547

**Phillip L. ARTIS**

v.

**OTTENBERG'S BAKERS, INC. and Reliance National Indemnity Co.**

**Record No. 2157–03–4.**

Court of Appeals of Virginia,
Alexandria.

June 1, 2004.

138

Humphreys, J., dissented and filed a separate opinion.

140

Craig A. Brown (Ashcraft & Gerel, L.L.P., on brief), Alexandria, for appellant.

Joseph F. Giordano (Vanessa L. Crockett; Semmes, Bowen & Semmes, P.C., on brief), Williamsburg, for appellees.

Present: FITZPATRICK, C.J., and HUMPHREYS and
CLEMENTS, JJ.

JEAN HARRISON CLEMENTS, Judge.

Phillip L. Artis (claimant) appeals a decision of the Workers'
Compensation Commission (commission) denying his claim for
temporary partial disability benefits following his termination
from selective employment provided by Ottenberg's Bakers,
Inc. (employer). Claimant contends the commission erred in
finding that he failed to prove his post-termination wage loss
was attributable to his compensable work-related psychiatric
disorder. We agree and, therefore, reverse and remand.

## I. BACKGROUND

The relevant facts in this case are not in dispute. On
October 2, 1999, claimant was employed as a route salesman
for employer. On that day, at approximately 3:45 a.m., while
en route in a delivery truck to one of employer's customers,
claimant came upon an apparent "road rage" incident on
Interstate 66 in Fairfax County. Several people involved in
the incident exited their vehicles and ran across the highway
in front of claimant's truck. The last person attempting to
cross the highway darted directly in the path of claimant's
vehicle. Although claimant attempted to avoid hitting that
person, he was unable to do so. Claimant's vehicle struck and
killed the individual. Claimant, who was in a "daze" and
hyperventilating after the accident, called employer to report
the accident. He informed employer's representative that he
was too distraught to finish his shift, but was told he had to
because employer had no one available to replace him. Claim-
ant finished his route, completed his paperwork, and drove
himself home.

Claimant missed some work after the accident. He testified
that, following the accident, he began to experience flashbacks
and fear "that it would happen again" and that he would be
"thought of as a killer." Those feelings, he testified, caused
him to experience "depression to the point ... [he] was

suicidal." His children, he further testified, "wanted to know why [he] was not getting out of bed or why [he] couldn't take them certain places." Eventually, claimant returned to work in a selective duty capacity, riding with other drivers at first and then driving different routes, sometimes with a co-driver along to assist him. Claimant testified he "was returned to full duty with the stipulation if I need help, ask the night manager and that would be provided, and that was refused on a few occasions."

The medical records in this case indicate that, on October 4, 1999, claimant sought medical treatment for back pain at the Providence Hospital Wellness Institute. He was diagnosed with a thoracic strain and excused from work through October 10, 1999. As of October 21, 1999, claimant's back pain had resolved.

On October 11, 1999, claimant returned to the Providence Hospital Wellness Institute for a follow-up evaluation. He reported that he was unable to drive and was suffering from emotional distress due to the accident.

On October 12, 1999, claimant came under the care of Dr. Cecil Harris, a clinical psychologist, for his emotional problems stemming from the fatal accident, including flashbacks of the accident, fear of driving and crossing the street, anxiety attacks, feelings of being a killer, trouble sleeping and getting out of bed, and problems maintaining an erection. Claimant's initial mental status examination by Dr. Harris "revealed a nervous, tense/anxious, depressed, agitated, phobic male who was fully oriented with sad, hopeless, and depressed affect, and depressed/irritable mood" and who "denied suicidal and homicidal ideation and was having trouble containing paranoid, hostile, and violent urges secondary to his anxious, agitated feelings." Claimant indicated in his intake questionnaire with Dr. Harris that he had received prior psychological treatment for "rage" in 1996 from Dr. Jones.

Dr. Harris diagnosed claimant as suffering from "PTSD" (posttraumatic stress disorder) and "Adjustment Disorder with Mixed Anxiety and Depressed Mood." Dr. Harris initi-

ated a "treatment plan of twice weekly, or as needed psychotherapy." Claimant received "generally weekly and sometimes bi-weekly" counseling treatment from Dr. Harris through at least July 2000. As part of his treatment, claimant also took Zyprexa, which was provided, on Dr. Harris's referral, by Dr. Walker Lyerly. Dr. Harris recommended that, in returning to work as a delivery truck driver, claimant should initially ride with another driver, then have another driver ride with him, and ultimately, "when ready," drive by himself.

Dr. Harris saw claimant for treatment five more times in October 1999. On October 14, 1999, Dr. Harris wrote in his contemporaneous treatment notes that claimant was "again unable to drive to session" and felt "angry, hostile[,] resentful, critical [and] competitive." On October 19, 1999, Dr. Harris noted that claimant "present[ed] [with] anxious, depressed affect." On October 22, 1999, Dr. Harris noted that claimant "presented [with complaints of] 'difficulty falling asleep, depressed, unable to get up in morning and loss of interest in sex.'" On October 25, 1999, Dr. Harris noted that claimant was "back to work" with a rider. He further noted that claimant was feeling a "lack of support from [employer]." On October 26, 1999, Dr. Harris noted that claimant was feeling employer was unsupportive because "they think I'm a killer."

On November 1, 1999, Dr. Harris noted that, while claimant was "making progress," he was "anxious [regarding his] driving/riding situation." Dr. Harris further noted that claimant was concerned employer was "not patient [with] him" and that claimant had "[f]ears [and] concerns [regarding his] ability to take care of his family." On November 15, 1999, Dr. Harris noted that claimant had "difficulty sleeping [secondary to] recurrent intrusive thoughts[:] leaves him tired, irritable [and] depressed." On November 19, 1999, Dr. Harris noted that claimant was experiencing increased fear at work because he was now riding with another driver "through D.C. traffic," but was "very pleased he was able to drive to [appointment with Dr. Harris] for first time using Beltway." On November 26, 1999, Dr. Harris noted that claimant was "feeling paranoid [regarding] job's support of his recovery efforts."

On December 17, 1999, Dr. Harris noted that claimant had been "serving as a co-driver since" mid-November 1999 and driving with a co-driver since December 8, 1999. On December 23, 1999, Dr. Harris noted that claimant had "[i]ssues related to driving assignment, symptomatic behavior [and] anger [regarding] perceived lack of full support by [employer]." On January 6, 2000, Dr. Harris noted that claimant was feeling "rage, agitation, depress[ion and] hopeless[ness]" and admitted "some suicidal ideations." On January 13, 2000, Dr. Harris noted that claimant was driving "solo," but continued "to feel lack of support at" work. On January 28, 2000, Dr. Harris noted that claimant was angry with "H.R. Dir. B.W. [and] Plant Mgr. J.G. for lack of support" because he was "not getting sick days approved" for his therapy sessions and was "assigned [a] route too difficult for his level of recovery at this time." On February 11, 2000, Dr. Harris noted that claimant felt employer was not supporting him because it was pressuring him to schedule his medical appointments "on his days off" and was failing to pay sick leave. On February 15, 2000, Dr. Harris noted that claimant was "still angry" and feeling "set up" to fail by employer. On February 18, 2000, Dr. Harris noted that claimant was "feeling better" and slept the "last few nights [with] no flashback of seeing accident victim run in front of vehicle in his dreams." Dr. Harris further noted that claimant had been riding with another driver on a new route to Baltimore and would be driving "some on his own for next few months."

In addition to documenting claimant's feelings that employer was not being supportive, Dr. Harris's treatment notes also contain several references to claimant's concerns about caring for his family. Throughout the sessions, Dr. Harris indicated in his notes that his treatment of claimant's condition consisted of providing "ventilation," encouragement, support, and reinforcement of claimant's strengths and progress, and focusing on claimant's troubles with problem solving, anger and stress management, and "thought stopping."

On March 3, 2000, Dr. Harris noted that claimant, having begun driving the new route on his own, felt his symptoms

were increasing and he was "taking a step backward." Dr. Harris further noted that claimant was thinking negative thoughts, including "more about violence," and was "worried" about his ability to control his anger. Dr. Harris also noted that claimant felt he would need a rider to assist him on his route. On April 7, 2000, Dr. Harris noted that claimant's request for a rider was denied and claimant was having "[i]ntrusive recollections of [a] man running in front of truck." On April 27, 2000, Dr. Harris noted that claimant was feeling "rage" and was again feeling unsupported by employer. Dr. Harris further noted that claimant requested a change in his medication prescription and would "terminate" his current medication, pending referral to a medical doctor.

On May 4, 2000, Dr. Harris noted claimant was upset because employer had assigned him to drive the route where the fatal accident had occurred on October 2, 1999, and insisted that he do so even though claimant explained to employer that he was "having trouble sleeping," was "having flashbacks," and was off his prescription medication at that point. Dr. Harris further noted that claimant was feeling "pushed, trapped like [a] cornered animal [and] rage." That same day, Dr. Harris wrote to William Walker, employer's human resources director, stating that claimant was "greatly stressed and somewhat regressed, secondary to being scheduled to service the route where his accident occurred on October 2, 1999." Claimant, Dr. Harris wrote, "is clinically not ready to service that particular route at this time. He has made much progress in his therapy and his rehabilitation is progressing well. It is however important that we continue to work closely together towards supporting his full recovery."

On May 9, 2000, Dr. Harris noted that claimant reported "suicidal ideation" and was feeling "provoked into his rageful feelings" because employer was "messing" with him. On June 1, 2000, Dr. Harris noted that claimant had increased "confidence to move forward now [without] a rider," but also noted that claimant described himself as homicidal. On June 7, 2000, Dr. Harris noted that claimant "feels he is coping [with] new route," but again noted claimant was experiencing symp-

toms, including homicidal feelings. On June 14, 2000, Dr. Harris noted that claimant had been "given a rider on Monday, which helped," but was told by the new dispatcher "that there would be no new approval for a new rider." Dr. Harris further noted that he would call or write employer regarding claimant's "need for a rider from time to time" and that he recommended to claimant that he continue with his medication. Dr. Harris's June 14, 2000 report indicated that claimant was feeling homicidal and that claimant could not function at his job.

Claimant testified that, at the time, he blamed Walker for denying him a "ride along helper." Claimant further testified that he believed, at the time, that Walker "was operating to get [him] out of the company."

On June 29, 2000, claimant "faked" a robbery of the delivery truck he was driving and filed a false police report indicating he had been robbed of approximately $250. Claimant was arrested and subsequently pled guilty to the charge of filing a false police report. Following his arrest, claimant was fired by employer. Claimant subsequently procured a series of jobs with various other employers.

Claimant testified he faked the robbery and filed the false report because he expected Walker to respond to the scene of the reported robbery, at which time he intended to kill him. His intention at the time, claimant testified, was "to do the same harm [to Walker that Walker] was doing to my family." He wanted to "get even" with Walker because Walker failed to adequately respond to his difficulties in performing his job after the October 2, 1999 accident. Claimant further testified that he staged the robbery attempt because "the bills were mounting" and he was having difficulty with child support issues at the time because employer "was delinquent on [his] child support that was being taken out every week and not being sen[t]." Claimant also testified that none of the factors that led to his wanting to kill Walker occurred prior to the October 2, 1999 accident and that he had never before suffered

symptoms similar to those he suffered as a result of the accident.

On July 18, 2000, Dr. Harris wrote a letter to claimant's union president, in which he summarized his diagnosis and treatment of claimant for "Posttraumatic Stress Disorder" and concluded as follows:

[Claimant] discussed in detail the incident of 06/29/00 in therapy. It is my opinion, based on the information I have, that [claimant's] involvement in this incident is related to his diagnosis.

On October 2, 2001, claimant filed a claim for benefits arising out of the accident on October 2, 1999. He alleged he "injured his back and suffered psychological injuries, including post-traumatic stress disorder as a direct result" of the compensable accident. Claimant sought medical benefits, an award of temporary total disability compensation from October 2, 1999, through December 17, 1999, and temporary partial disability compensation for various periods following the termination of his employment with employer.[1]

In responding to a questionnaire sent to him by claimant's counsel on September 24, 2002, Dr. Harris wrote that his "accident-related diagnos[i]s" of claimant was "(PTSD)—Posttraumatic Stress Disorder—chronic." Asked if the work restrictions placed on claimant's employment because of his accident-related condition were permanent, Dr. Harris noted as follows:

No, early return to driving alone was [and] is the goal. Periodically, depending on the situation there may be times when he may need to temporarily self-modify his own driving exposure. Consequently, he is not ready at this time to return to the type of driving he did at the time of his

---

1. Pursuant to his claim, as modified at the hearing before the deputy commissioner, claimant sought temporary partial disability compensation for the following periods: July 14, 2000, through August 25, 2000; August 26, 2000, through September 9, 2000; September 30, 2000, through May 1, 2001; October 13, 2001, through April 30, 2002; and May 17, 2002, through November 9, 2002.

trauma. Over the course of our continued contact in his therapy off [and] on he has brief periods of higher level driving function followed by trauma-triggered dangerous aggressions in his driving skills.

Asked to explain the basis for his conclusion that "the feigned robbery resulted directly from [claimant's] accident-related psychiatric condition," Dr. Harris further noted as follows:

I still hold the opinion that the feigned robbery of 06/29/00 resulted directly from [claimant's] accident-related psychiatric condition. [Claimant] was still actively traumatized by his 10/02/99 fatality, on 06/29/00. He was also frustrated, angry, fearful and problem-solving very poorly at that time. He was sleep deprived [with] suicidal ideation as well. In his mind this was not an act of robbery, but one of symbolically regaining his loss of control.

At the December 9, 2002 evidentiary hearing before the deputy commissioner, employer stipulated that claimant had experienced a compensable accident arising out of and in the course of his employment on October 2, 1999, when he unavoidably struck and killed a pedestrian on the highway. Employer also acknowledged that there was some injury to claimant's back and some psychological injury resulting directly from that accident. Employer further agreed that some compensation was voluntarily paid and that "psychiatric treatment [was] authorized and paid for at least up until a certain point." Employer defended the claim on the grounds that claimant was not disabled in the nature or to the extent alleged, that there was no causal relationship between the injury by accident and the subsequent periods of disability alleged by claimant, and that claimant was not entitled to any partial disability compensation after he was terminated for cause from his employer-supplied selective duty employment on June 29, 2000.

In addition to the parties' stipulations, the evidence before the deputy commissioner consisted, in relevant part, of claimant's testimony and the reports and opinions of Dr. Harris regarding his treatment of claimant's psychological condition.

Based on the parties' stipulations, the deputy commissioner found that claimant "experienced a compensable injury by accident on October 2, 1999, as alleged, resulting primarily in a post-traumatic stress disorder." The deputy commissioner also determined that "claimant carried his burden of proving entitlement to temporary [total] disability compensation from October 4, 1999, through October 10, 1999," only. The deputy commissioner further held as follows:

> We further conclude that the employer's termination of the claimant on June 29, 2000, based upon his fabrication of a robbery and the filing of a false police report, was for justified cause sufficient to permanently bar the claimant's entitlement to partial wage loss compensation thereafter.... We further conclude that the claimant's wage loss after June 29, 2000, is properly attributable to his own conduct, and not to any disability resulting from the October 2, 1999 injury by accident. We reach this conclusion notwithstanding Dr. Harris'[s] opinion that on June 29, 2000, the claimant remained "actively traumatized" by the events of October 2, 1999, and that his action in feigning the robbery attempt was "one of symbolically regaining his loss of control." To the extent the claimant then felt pressured by the employer to resume his normal work activities, a conclusion we doubt based upon our assessment of the claimant's credibility, the claimant had various other options available to him other than feigning a robbery so that he might attempt a murder.

Upon review, the full commission affirmed the deputy commissioner's decision, finding as follows:

> The evidence in this case establishes that the claimant was under some restrictions at the time of his discharge. He was discharged after he feigned a robbery with the intent to harm an individual employed by the employer. Dr. Harris implicated a variety of factors which led to this behavior, including the claimant's frustration and anger. A close review of Dr. Harris's contemporaneous treatment notes, as well as the claimant's testimony, demonstrates that the claimant's main problems were not directly related to

his accident. The claimant's problems involved anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma. These problems are of a nature more akin to stress resulting from an employee's interaction with his supervisors, which is not compensable. *See Teasley v. Montgomery Ward & Co.*, 14 Va.App. 45, 415 S.E.2d 596 (1992). We also note that the documentary [evidence] reveals pre-existing problems with anger or "rage," despite the claimant's denials to the contrary.

We find that the totality of the evidence shows that the claimant was responsible for his wrongful actions on June 29, 2000. Under the circumstances presented, we agree that the claimant was discharged for justified cause, supporting the forfeiture of benefits.

This appeal by claimant followed.

## II. ANALYSIS

On appeal, claimant does not challenge employer's right to terminate him for feigning the robbery. He argues, however, that his termination from selective employment did not justify a forfeiture of subsequent workers' compensation benefits. The uncontradicted medical evidence in the record, he asserts, clearly demonstrates that his action in feigning the robbery on June 29, 2000, was caused by his psychiatric disability, which directly resulted from his October 2, 1999 compensable industrial accident. Hence, he contends the commission erred, as a matter of law, in finding that he failed to meet his burden of proving that his termination and resulting wage loss were causally related to his accident and in ruling, based on that finding, that his discharge "for justified cause" precluded him from receiving post-termination temporary partial disability compensation.

Employer concedes on appeal, as it did below, that claimant suffered a compensable psychiatric injury, diagnosed as post-traumatic stress disorder, as a result of claimant's industrial

accident on October 2, 1999. Employer asserts, however, that the credible evidence demonstrates that, having recovered from his accident-related mental disorder and having been released to work by Dr. Harris, claimant feigned the robbery on June 29, 2000, "in an attempt to obtain money to pay his bills" and because of his "anger at his employer, frustration over his financial status and child support payments, and perceived problems with employment issues not directly related to the Claimant's work accident." Such reasons, employer maintains in reliance on *Teasley*, 14 Va.App. 45, 415 S.E.2d 596, are unrelated to the compensable accident and, thus, do "not provide a basis for awarding compensation" following claimant's termination from selective employment. Moreover, employer asserts, the credible evidence demonstrates that claimant "had pre-existing mental health issues prior to the accident of October 2, 1999." Thus, employer argues, the commission correctly found that claimant "was wholly responsible for his wrongful acts on June 29, 2000" and that those acts were not related to his October 2, 1999 accident. Because the record contains credible evidence supporting the commission's factual findings, employer's argument continues, this Court is bound by those findings. Accordingly, employer concludes, the commission's ruling, based on those findings, that employer was not responsible for claimant's post-termination wage loss "must be affirmed." We disagree with employer's position.

 In *Timbrook v. O'Sullivan Corp.*, 17 Va.App. 594, 597, 439 S.E.2d 873, 875 (1994), we explained that

an employee on selective employment offered or procured by the employer, who is discharged for cause *and for reasons not concerning the disability*, forfeits his or her right to compensation benefits like any other employee who loses employment benefits when discharged for cause. *Goodyear Tire & Rubber Co. v. Watson*, 219 Va. 830, 833, 252 S.E.2d 310, 312–13 (1979); *Marval Poultry Co. v. Johnson*, 224 Va. 597, 601, 299 S.E.2d 343, 345 (1983). The reason for the rule is that the wage loss is attributable to the employee's wrongful act *rather than the disability.*

(Emphases added.) Thus, a discharge from selective employment does not "create a forfeiture of workers' compensation benefits" if "the reason for the discharge ... concern[s]" the employee's disability. *Id.* at 598–99, 439 S.E.2d at 876. In *Eppling v. Schultz Dining Programs*, 18 Va.App. 125, 128, 442 S.E.2d 219, 221 (1994), we further explained:

When a disabled employee is discharged from selective employment, the "inquiry focuses on whether the claimant's benefits may continue in light of [the] dismissal." *Richmond Cold Storage Co. v. Burton*, 1 Va.App. 106, 111, 335 S.E.2d 847, 850 (1985). An employee's workers' compensation benefits will be permanently forfeited only when the employee's dismissal is "justified," the same as any other employee who forfeits ... benefits when discharged for a "justified" reason. *Id.*

A "justified" discharge (one which warrants forever barring reinstatement of workers' compensation benefits) does not simply mean that the employer can identify or assign a reason attributable to the employee as the cause for his or her being discharged. Whether the reason for the discharge is for "cause," *see [Chesapeake & Potomac Telephone Co. v. Murphy*, 12 Va.App. 633, 639, 406 S.E.2d 190, 193, *aff'd en banc*, 13 Va.App. 304, 411 S.E.2d 444 (1991)], or is "justified" for purposes of forfeiting benefits must be determined in the context of the purpose of the Act [2] and whether the conduct is of such a nature that it warrants a permanent forfeiture of those rights and benefits. "The Commission ... must be mindful of the purposes and goals of the" Act. *Burton*, 1 Va.App. at 111, 335 S.E.2d at 850. (Footnote added.) Accordingly, "[i]n order to work a forfeiture, the 'wage loss [must be] properly attributable to [the employee's] wrongful act ... for which the employee is responsible,'" *id.* at 129, 442 S.E.2d at 222 (quoting *Murphy*, 12

---

**2.** "The fundamental purpose of the Workers' Compensation Act ... [is] compensation for accidental injuries within the hazards of the employment." *Morris v. Morris*, 238 Va. 578, 584, 385 S.E.2d 858, 861 (1989). "[T]he remedial purpose of the Act entitles it to liberal construction." *Id.* at 584, 385 S.E.2d at 862.

Va.App. at 640, 406 S.E.2d at 193), *and* not properly attributable to the employee's disability, *Timbrook,* 17 Va.App. at 598–99, 439 S.E.2d at 876.

For example, in *Timbrook,* we determined that an injured employee's discharge from selective employment for work-related misconduct did not bar her right to post-termination compensation benefits because, among other reasons, the employee "was discharged for a 'reason[ ] concerning [her] disability.' " *Id.* at 599, 439 S.E.2d at 876. In *Eppling,* "we held that the claimant's excessive absenteeism caused by a non-work-related [health problem] beyond the employee's control was not the type of wrongful act which, upon termination [from selective employment], justified a forfeiture of workers' compensation benefits." *Walter Reed Convalescent Center v. Reese,* 24 Va.App. 328, 336, 482 S.E.2d 92, 97–98 (1997) (citing *Eppling,* 18 Va.App. at 129–30, 442 S.E.2d at 222). Conversely, in *Richfood, Inc. v. Williams,* 20 Va.App. 404, 409, 457 S.E.2d 417, 419 (1995), we held that an injured employee who was discharged from selective employment for work-related misconduct was not entitled to further disability benefits because "the reason for [the employee's] termination was unrelated to his injury and was due solely to his misconduct." In *Reese,* we concluded that a partially disabled employee was not entitled to compensation for her post-termination wage loss because the employee's termination from selective employment for her "repeated negligent errors" at work was not caused by her compensable injury. 24 Va.App. at 338–39, 482 S.E.2d at 97–98. We further explained in *Reese:*

> In this case, the evidence established as a matter of law that claimant's wrongful acts . . . and not her injury or disability, caused her wage loss. Thus, this loss was not employer's responsibility. The evidence established that claimant's termination was unrelated to her injury and was due solely to her misconduct. . . . In this case, credible evidence established that claimant's failure to properly perform her job was caused by her incompetence, not her

injury. No *credible* evidence showed that claimant's mistakes were caused by her injury or its residual effects. *Id.*

Accordingly, in order to prevail on his claim for post-termination workers' compensation benefits in this case, claimant had to prove by a preponderance of the evidence that his termination from selective employment was causally related to his October 2, 1999 compensable industrial accident "or its residual effects." *Id.*; *Hungerford Mechanical Corp. v. Hobson*, 11 Va.App. 675, 678, 401 S.E.2d 213, 215 (1991) (noting that a claimant has the burden of establishing by a preponderance of the evidence that he is entitled to compensation); *see also Leonard v. Arnold*, 218 Va. 210, 214, 237 S.E.2d 97, 100 (1977) ("When a primary injury under the Work[ers]'s Compensation Act is shown to have arisen out of the course of employment, every natural consequence that flows from the injury is compensable if it is a direct and natural result of [the] primary injury."); *Chesterfield County v. Dunn*, 9 Va. App. 475, 477, 389 S.E.2d 180, 182 (1990) ("To be compensable as an injury by accident, a purely psychological injury must be causally related to a physical injury or causally related to an obvious sudden shock or fright arising in the course of employment."). Otherwise, employer was not responsible for that wage loss. *Reese*, 24 Va.App. at 338, 482 S.E.2d at 97.

The commission concluded that claimant's discharge was due to his misconduct in feigning the robbery, for which he was responsible, and was not attributable to his October 2, 1999 industrial accident. In reaching that decision, the commission wholly rejected Dr. Harris's opinion that "the feigned robbery . . . resulted directly from [claimant's] accident-related psychiatric condition." Relying instead on Dr. Harris's treatment notes and claimant's testimony, the commission found that claimant's fabrication of the robbery was brought on by his "anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma." Such problems, the commission found, were "of a nature more akin to stress

resulting from an employee's interaction with his supervisors, which is not compensable," under *Teasley*, 14 Va.App. 45, 415 S.E.2d 596. The commission added that claimant had "pre-existing problems with anger or 'rage.' "

The commission's determination whether a claimant's post-termination wage loss is causally related to his compensable injury by accident is a finding of fact. *See Reese*, 24 Va.App. at 335, 337, 482 S.E.2d at 96–97; *Ingersoll–Rand Co. v. Musick*, 7 Va.App. 684, 688, 376 S.E.2d 814, 817 (1989) (noting that a "determination of causation is a factual finding"). Likewise, the commission's resolution of "conflicting expert opinions," including "an internal conflict in an expert's opinion," is within the purview of the commission's fact-finding authority. *Chandler v. Schmidt Baking Co.*, 228 Va. 265, 268, 321 S.E.2d 296, 297 (1984). "Although the findings of the . . . Commission, if based on credible evidence, are conclusive and binding upon us, the Commission's findings of fact are not binding upon us when there is no credible evidence to support them. The question of sufficiency of the evidence then becomes one of law." *Morris v. Badger Powhatan/Figgie Int'l, Inc.*, 3 Va.App. 276, 279, 348 S.E.2d 876, 877 (1986). "In determining whether credible evidence exists, the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses." *Wagner Enters., Inc. v. Brooks*, 12 Va.App. 890, 894, 407 S.E.2d 32, 35 (1991).

Moreover,
[t]he commission may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses, which is not inherently incredible and not inconsistent with other facts in the record. Whether credible evidence exists to support a factual finding is a question of law which is properly reviewable on appeal. Causation is a factual determination to be made by the commission, but the standards required to prove causation and whether the evidence is sufficient to meet those standards are legal issues which we must determine. In considering whether credible evidence exists to

support the necessary factual findings, we view the evidence in the light most favorable to the party prevailing below. *Hercules v. Gunther,* 13 Va.App. 357, 361, 412 S.E.2d 185, 187 (1991) (citations omitted).

 "A finding of causation need not be based exclusively on medical evidence. 'The testimony of a claimant may also be considered in determining causation, especially where the medical testimony is inconclusive.' " *Lee County Sch. Bd. v. Miller,* 38 Va.App. 253, 260, 563 S.E.2d 374, 377–78 (2002) (quoting *Dollar Gen'l Store v. Cridlin,* 22 Va.App. 171, 176, 468 S.E.2d 152, 154 (1996)). Furthermore, while "[m]edical evidence is not necessarily conclusive, but ... subject to the commission's consideration and weighing," *Hobson,* 11 Va.App. at 677, 401 S.E.2d at 215, " '[i]n matters ... which are not of common knowledge we must accept the opinion of experts. There is no other way in which an intelligent conclusion can be reached....' " *Walrod v. Matthews,* 210 Va. 382, 389, 171 S.E.2d 180, 185 (1969) (quoting *Lawson v. Darter,* 157 Va. 284, 293, 160 S.E. 74, 77 (1931)); *see also Seneca Falls Greenhouse & Nursery v. Layton,* 9 Va.App. 482, 487, 389 S.E.2d 184, 187 (1990) (noting that, in matters that "are not common knowledge, the court must accept the opinion of experts"). We are further guided by the long-standing principle that,

> when an attending [medical expert] is positive in his diagnosis of a disease, great weight will be given by the courts to his opinion. However, when it appears ... that the diagnosis is shaded by doubt, and there is medical expert opinion contrary to the opinion of the attending [medical expert], then the trier of the fact is left free to adopt that view which is most consistent with reason and justice.

*Bristol Builders Supply Co. v. McReynolds,* 157 Va. 468, 471, 162 S.E. 8, 9 (1932).

 Applying these principles to the instant case, we conclude that, as a matter of law, there is no credible evidence in the record to support the commission's finding that claimant was discharged from selective employment for reasons unrelated to his compensable work-related accident. To the con-

trary, we find that all of the relevant credible evidence in the record plainly supports the conclusion that claimant's action in fabricating the robbery was directly related to his October 2, 1999 work-related accident.

On October 2, 1999, claimant was involved in a traffic accident in which he unavoidably struck and killed a pedestrian with his delivery truck while working for employer. Because of that accident, claimant suffered from numerous emotional problems, including flashbacks of the accident, fear of driving and crossing the street, anxiety attacks, feelings of being a killer, trouble sleeping and getting out of bed, and problems maintaining an erection. Dr. Harris, a clinical psychologist who first treated claimant ten days after the accident and continued treating him several times a month thereafter through at least July 2000, noted at intake that, having suffered the accident, claimant was a "nervous, tense/anxious, depressed, agitated, phobic male who was fully oriented with sad, hopeless, and depressed affect, and depressed/irritable mood," and who "was having trouble containing paranoid, hostile, and violent urges secondary to his anxious, agitated feelings." Dr. Harris specifically diagnosed claimant as suffering from posttraumatic stress disorder and "Adjustment Disorder with Mixed Anxiety and Depressed Mood" directly caused by the October 2, 1999 industrial accident. Dr. Harris was positive in his diagnosis and no evidence from any other mental health expert was provided to contradict that diagnosis. Employer accepted claimant's psychological injury as compensable and voluntarily authorized and paid for treatment of that condition, "up until a certain point."

At no point between October 12, 1999, and June 29, 2000, did Dr. Harris release claimant to full employment or otherwise indicate that claimant had recovered from his accident-related psychological injury, as employer claims. To the contrary, as Dr. Harris noted, although claimant was able to achieve "brief periods of higher level driving function" at times, he continued to "need to temporarily self-modify his own driving exposure" when the symptoms of his disorder affected his ability to drive safely. Indeed, the commission

noted that claimant was still on selective employment at the time of the feigned robbery. Moreover, Dr. Harris's contemporaneous treatment notes indicate that claimant's underlying mental disorder continued throughout that period and adversely affected his ability to problem solve, control negative thoughts, and manage stress and anger during that entire time.

As late as March 3, 2000, Dr. Harris wrote that, having started driving a new route on his own, claimant was thinking "more about violence" and had concerns about his ability to control his anger. Dr. Harris further noted that claimant would need a rider to assist him on the route. On April 7, 2000, Dr. Harris indicated in his notes that claimant was having flashbacks of a "man running in front of [his] truck." On April 27, 2000, Dr. Harris wrote that claimant was feeling "rage" and was going to terminate his medication. On May 4, 2000, Dr. Harris noted claimant was upset because employer had assigned him to drive the route where the fatal accident had occurred on October 2, 1999, and insisted that he do so even though claimant explained to employer that he was "having trouble sleeping," was "having flashbacks," and was off his prescription medication at that point. Dr. Harris further noted that claimant was feeling "pushed, trapped like [a] cornered animal [and] rage." That same day, Dr. Harris sent a letter to employer, stating that claimant was "greatly stressed and somewhat regressed, secondary to being scheduled to service the route where his accident occurred on October 2, 1999." Dr. Harris further stated in his letter that claimant was "clinically not ready to service that particular route at this time. He has made much progress in his therapy and his rehabilitation is progressing well. It is however important that we continue to work closely together towards supporting his full recovery."

Dr. Harris's records from June 7, 2000, indicate that claimant was experiencing symptoms, including homicidal feelings. On June 14, 2000, Dr. Harris noted that claimant was told by employer that he could not get any more riders to assist him on his routes. Dr. Harris further noted that he would call or

write employer regarding claimant's "need for a rider from time to time" and that he recommended claimant continue with his medication.

On July 18, 2000, less than three weeks after claimant's fabrication of the robbery, Dr. Harris opined that claimant's involvement in the June 29, 2000 incident was "related to" claimant's diagnosis of posttraumatic stress disorder. Dr. Harris further opined on September 24, 2002, that, as a result of the October 2, 1999 accident, claimant suffered from chronic posttraumatic stress disorder. Dr. Harris also opined on September 24, 2002, that "the feigned robbery of 06/29/00 resulted directly from [claimant's] accident-related psychiatric condition. [Claimant] was still actively traumatized by his 10/02/99 fatality, on 06/29/00. He was also frustrated, angry, fearful and problem-solving very poorly at that time. He was sleep deprived [with] suicidal ideation as well." Again, Dr. Harris was positive in his diagnosis and opinion, and no other mental health professional's opinion was offered to refute them.

We find nothing in the record, particularly in Dr. Harris's treatment notes and claimant's testimony, that is inconsistent with Dr. Harris's diagnosis and opinion. Despite rejecting Dr. Harris's opinion, the commission identified no such specific inconsistency in the record. Clearly, claimant never testified that his feigning of the robbery was unrelated to his October 2, 1999 accident. Nor does anything in Dr. Harris's extensive records suggest that the two incidents were not causally related. Indeed, Dr. Harris's notations and claimant's testimony regarding claimant's "anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma" are entirely consistent with some of the symptoms documented by Dr. Harris that claimant experienced in connection with his accident-related mental disorder: his inability to problem solve, control negative thoughts, and manage stress and anger. As such, Dr. Harris's notations and claimant's testimony comport with Dr. Harris's opinion that claimant's involvement in

the June 29, 2000 incident was causally related to his accident-related psychological disorder. Dr. Harris's unequivocal expert opinion may not, therefore, be disregarded by the commission as "inherently incredible" or "inconsistent with other facts in the record." *Hercules,* 13 Va.App. at 361, 412 S.E.2d at 187. Accordingly, the commission could not properly rely solely on isolated portions of Dr. Harris's notes and claimant's testimony that were not inconsistent with Dr. Harris's expert opinion to arbitrarily discount that opinion and to conclude on its own that "claimant's main problems were not directly related to his accident." To do so on this record, despite the egregious nature of claimant's conduct in feigning the robbery, undermines the purpose of the Workers' Compensation Act.

Likewise, the commission's reliance on our decision in *Teasley,* 14 Va.App. 45, 415 S.E.2d 596, to resolve the issue presented in this case is misplaced.

In *Teasley,* the employee, *following an ongoing series of disagreements,* had a confrontation with his supervisor over his work assignments. He broke down emotionally and was diagnosed with [posttraumatic stress disorder due to the workplace confrontation]. He sought benefits, contending that his [posttraumatic stress disorder] was an occupational disease. The commission ... denied the employee's claim because he failed to prove entitlement to compensation under Code § 65.1-46.1 (now Code § 65.2-401).

*Mottram v. Fairfax County Fire & Rescue Dep't,* 35 Va.App. 85, 94, 542 S.E.2d 811, 814-15 (2001) (emphasis added) (citing *Teasley,* 14 Va.App. at 49-50, 415 S.E.2d at 598-99), *aff'd in part and rev'd in part,* 263 Va. 365, 375, 559 S.E.2d 698, 703 (2002). Holding that "purely psychological disability" resulting from "disagreements over managerial decisions and conflicts with supervisory personnel that cause stressful consequences ... ordinarily are not compensable," we affirmed that decision. *Teasley,* 14 Va.App. at 49, 415 S.E.2d at 598.

Here, unlike in *Teasley,* it is undisputed that claimant's posttraumatic stress disorder arose from his October 2, 1999 work-related accident when he unavoidably killed a pedestrian,

and not because of any disagreements or conflicts with employer. Claimant's problems with employer subsequently arose and grew progressively worse as a result of his psychological disorder, not vice versa. Indeed, claimant's testimony that none of the problems with employer that led to his feigning the robbery existed before the accident was uncontradicted. Hence, *Teasley* is inapplicable here.

 Furthermore, the commission's vague reliance on the fact that claimant had a prior problem with rage as a dispositive factor in this case is also misplaced. While claimant indicated in his intake questionnaire with Dr. Harris that he had received prior psychological treatment for "rage" in 1996, no evidence was presented showing the precise nature or severity of that problem or the treatment therefor. Moreover, no evidence was presented to show that such a condition persisted three years later in 1999 or was related in any way to claimant's posttraumatic stress disorder arising from the October 2, 1999 industrial accident. To the contrary, claimant testified that he had not previously suffered any symptoms similar to those he suffered as a result of the fatal accident. Claimant's testimony was uncontradicted. Clearly, Dr. Harris was aware of that notation by claimant in the questionnaire when he opined that claimant's conduct on June 29, 2000, was directly related to the October 2, 1999 accident. Dr. Harris drew no causal connection, in his treatment notes or elsewhere, between the prior condition noted by claimant and claimant's psychiatric disorder resulting from the accident. Nor, as previously noted, did any other health care professional do so in the record before us.

 Even were we to assume that claimant's prior treatment for rage was relevant to the issue before us, "[i]t is well established that the employer takes the employee as the employer finds the employee, even where the employee suffers some [pre-existing] infirmity." *Williams Indus., Inc. v. Wagoner*, 24 Va.App. 181, 187–88, 480 S.E.2d 788, 791 (1997). "A finding that a pre-existing condition 'was accelerated or aggravated' by an injury sustained in an industrial accident estab-

lishes a causal connection between the injury and disability[,] and the 'disability resulting therefrom is compensable under the Workers' Compensation Act.' " *Southern Iron Works, Inc. v. Wallace,* 16 Va.App. 131, 134, 428 S.E.2d 32, 34 (1993) (quoting *Olsten of Richmond v. Leftwich,* 230 Va. 317, 320, 336 S.E.2d 893, 895 (1985)). Plainly, if claimant had a pre-existing psychological condition, the evidence in this case is sufficient to show that the psychological impact of claimant's traumatic October 2, 1999 accident was severe enough to have "accelerated or aggravated" that condition. Therefore, the mere, undeveloped fact that claimant received treatment for a prior psychological condition in 1996 is not persuasive evidence to show that claimant's discharge from selective employment was not properly attributable to the psychiatric disability he suffered as a direct result of his October 2, 1999 compensable accident.

Thus, based on the record in this case, we hold, as a matter of law, that no credible evidence supports the commission's finding of fact that claimant's post-termination wage loss was causally related solely to his misconduct on June 29, 2000, and not to his October 2, 1999 compensable injury by accident, such that claimant forfeited his right to workers' compensation benefits after June 29, 2000. We further hold that claimant met his burden of proving his entitlement to disability compensation for his post-termination wage loss. Dr. Harris's unequivocal expert opinion was that claimant suffered from posttraumatic stress disorder resulting from his October 2, 1999 compensable accident and that claimant's actions on June 29, 2000, resulted directly from that disorder. No other evidence contradicts Dr. Harris's opinion, and we find no internal conflict in it. This evidence supports the conclusion that claimant's termination from selective duty employment was causally related to his compensable disability. Thus, consistent with the purpose of the Workers' Compensation Act, employer is responsible for claimant's resulting post-termination wage loss. *See Reese,* 24 Va.App. at 338, 482 S.E.2d at 97.

For these reasons, we conclude that the commission erred in denying claimants claim for post-termination temporary partial disability benefits. Accordingly, we will reverse the commission's decision, enter judgment in favor of claimant, and remand this case to the commission for the purpose of calculating the amount of claimant's post-termination workers' compensation benefits.

*Reversed and remanded.*

HUMPHREYS, J., dissenting.

Although the record in this case strongly suggests that the employer here failed to treat Artis with an appropriate level of regard,[3] I would affirm the commission's decision that "the totality of the evidence shows that the claimant was responsible for his wrongful actions on June 29, 2000." In my opinion, the record clearly supports the commission's implicit determination that the employer did not terminate Artis because of his injury or its "residual effects," as found by the majority. Instead, the record demonstrates that the employer terminated Artis because of his volitional, criminal acts—acts, which Artis himself testified would have culminated in homicide, had the circumstances occurred according to Artis's criminal plan. Thus, I believe the commission's denial of Artis's request for post-termination temporary partial disability benefits was supported both in law and fact.

As the majority notes,

[w]ell established principles of workers' compensation law [must] guide our decision in this case. First, "[t]he purpose of the Workers' Compensation Act is to provide compensation to an employee for the loss of his opportunity to engage in work, when his disability is occasioned by an injury suffered from an accident arising out of and in the course of his employment. The Act should be liberally construed in harmony with its humane purpose." *Barnett v. D.L. Brom-*

---

3. I find it particularly troubling that the employer forced Artis to complete his route immediately after this tragic accident occurred.

*well, Inc.,* 6 Va.App. 30, 33–34, 366 S.E.2d 271, 272 (1988) (en banc) (citations omitted).

*Potomac Edison Co. v. Cash,* 18 Va.App. 629, 631–32, 446 S.E.2d 155, 156 (1994). "Under the Act, an employee who is properly terminated from selective employment procured by the employer for cause consisting of willful misconduct forfeits his or her entitlement to future temporary partial disability benefits." *Id.* In such circumstances, we have been "unable to find any provision within the Workers' Compensation Act which evidences an intent by the legislature to place such an employee in a better position than an uninjured employee who is terminated for cause and by his wrongful act suffers a loss of income." *C & P Telephone v. Murphy,* 12 Va.App. 633, 640, 406 S.E.2d 190, 193, *aff'd en banc,* 13 Va.App. 304, 411 S.E.2d 444 (1991).

Thus, in determining whether to impose a forfeiture, the commission must "consider the nature of [the] conduct," which is alleged to constitute the cause or to justify the dismissal. *Eppling v. Schultz Dining Programs,* 18 Va.App. 125, 129, 442 S.E.2d 219, 221 (1994). In conducting this analysis, the commission must be mindful that not every "type of willful conduct or misbehavior [rises to the level] that, upon termination, justifies a forfeiture of workers' compensation benefits [under *Murphy*]." *Id.* at 130, 442 S.E.2d at 222. Although we have yet to specify the type of conduct falling within this category, we have held that "in order to work a forfeiture, the 'wage loss [must be] properly attributable to [the employee's] wrongful act . . . *[for which t]he employee is responsible."* *Id.* (quoting *Murphy,* 12 Va.App. at 639–40, 406 S.E.2d at 193) (emphasis added). Accordingly, as noted by the majority, because "[t]he purpose of the [Act] is to compensate employees when they lose an opportunity to engage in work after suffering work-related injuries," *Arlington County Fire Dep't v. Stebbins,* 21 Va.App. 570, 572, 466 S.E.2d 124, 125–26 (1996), a factual analysis of each individual case must prove that the termination at issue was not "attributable to the employee's [injury]."

Simply put, we liberally construe the Act so as to protect those employees who are no longer able to work because of a work-related accident, even in the face of some types of misconduct—particularly conduct for which the employee cannot be held responsible. That is not the case here.

In finding that Artis's termination was "attributable" to his injury, the majority relies upon Artis's psychologist's opinion that Artis's conduct was caused by his PTSD.[4] Assuming without deciding that despite its decision to terminate benefits, the commission necessarily accepted this opinion as true, I believe the majority gives short shrift to the crucial fact that no evidence established this "causal relationship" affected Artis to such an extent that his actions were "beyond [his] control." *Walter Reed Convalescent Center v. Reese*, 24 Va. App. 328, 338–39, 482 S.E.2d 92, 97–98 (1997). Indeed, the case at bar is inapposite to *Timbrook v. O'Sullivan Corp.*, 17 Va.App. 594, 439 S.E.2d 873 (1994), and *Eppling*. In *Timbrook*,

> [we] held that the *Murphy* forfeiture rule does not apply to an employee who was discharged for failing to notify her employer that she would be absent *from selective employment that she had refused.* Because the employee had refused, or not accepted, the employer's offer of selective employment, her termination following three consecutive absences was "not for cause or for misconduct, as in *Murphy*, [which would] justify a forfeiture of her compensation benefits that could never be cured." [*Timbrook*, 17 Va.App. at 598, 439 S.E.2d at 876].

---

**4.** I must conclude from the majority's rather sparse analysis that it has either invaded the province of the commission as fact finder to reach the conclusion that Artis's criminal actions were non-volitional, or the majority is implicitly holding today that misconduct of any kind, obviously including criminal activity up to the level of a homicide, does not justify a termination of benefits if there is *any* nexus between the misconduct and the injury irrespective of any public policy considerations the General Assembly may have had in mind in placing limitations on the continuation of benefits. Although I am unsure which is the case, I cannot embrace either scenario.

*Eppling,* 18 Va.App. at 129–30, 442 S.E.2d at 222 (discussing *Timbrook,* 17 Va.App. at 598, 439 S.E.2d at 876) (emphasis added). In *Eppling,* "we held that the claimant's excessive absenteeism caused by a non-work-related injury *beyond the employee's control* was not the type of wrongful act which, upon termination, justified a forfeiture of workers' compensation benefits." *Reese,* 24 Va.App. at 338, 482 S.E.2d at 98 (discussing *Eppling,* 18 Va.App. at 129–30, 442 S.E.2d at 222) (emphasis added).

Here, Artis's conduct was not related to a refusal of selective employment, nor was it in any way related to the procedural aspects of his claim for workers' compensation benefits. Moreover, there is no evidence in the record suggesting that Artis could not perform the duties of his selective employment for reasons, related to his injury, that were beyond his control. In fact, the evidence demonstrates that Artis was fully capable of performing his duties and that he did so. Thus, there is simply no evidence that Artis was terminated because of his work-related injury or its residual effects.

Instead, the record supports the commission's conclusion that Artis was terminated as a direct result of his volitional, criminal acts. Specifically, because Artis was frustrated and angry toward his supervisor, as well as other aspects of his personal life, he staged a robbery, misappropriating $200 of the employer's funds, with the intent of murdering his supervisor once he arrived at the scene. Even were we to give more weight to Artis's psychologist's opinion than that given to it by the commission, the evidence still falls short of establishing that Artis's "causally related" actions were beyond his control. To the contrary, Artis himself testified that he acted with premeditation, and with knowledge of his actions and the consequences thereof.

Accordingly, I would find that the commission correctly determined Artis was terminated, not for reasons related to his injury or its residual effects, but for misconduct for which he was fully "responsible." In fact, to carry the majority's analysis to its logical conclusion, what we hold today is that if

Artis had been successful, and murdered his supervisor, the employer would still be required to provide him with the benefits at issue because such conduct would be, at least in part, causally related to his PTSD and therefore, not the type of misconduct or misbehavior envisioned by our decision in *Murphy.*

Because I believe that Artis's volitional conduct amounted to precisely the type of "wrongful act" that would "justif[y]" a forfeiture of compensation benefits, I simply cannot agree with such a conclusion. *Murphy*, 12 Va.App. at 639, 406 S.E.2d at 193. I would thus affirm the decision of the commission. *See Marval Poultry Co. v. Johnson*, 224 Va. 597, 598, 299 S.E.2d 343, 344 (1983) (holding that a disabled employee on selective work status was no longer entitled to workers' compensation benefits when "he [was] discharged by his employer for dishonesty"); *Goodyear Tire & Rubber Co. v. Watson*, 219 Va. 830, 833, 252 S.E.2d 310, 313 (1979) (holding that a partially disabled employee's rights to compensation benefits were properly terminated when the employee was discharged because he had been "an exceedingly poor worker during the entire period of his employment . . . he had a great number of absences from work, and . . . several times he left his job without authorization"); *Richfood, Inc. v. Williams*, 20 Va. App. 404, 410, 457 S.E.2d 417, 420 (1995) ("Where passing drug and alcohol screening is made a clear and unequivocal condition of employment, . . . failure to pass the screening is tantamount to misconduct . . . for which an employee can be terminated."); *Murphy*, 12 Va.App. at 639, 406 S.E.2d at 193 (holding that an employee's conduct constituted "cause" for discharge, justifying a forfeiture of benefits, where he was guilty of fraudulent misrepresentations in his attempt to obtain compensation benefits).