COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Alston and Decker
Argued at Richmond, Virginia

UNITED PARCEL SERVICE, INC. AND
 LIBERTY INSURANCE CORPORATION

v.      Record No. 0006-14-2

KIRK V. PRINCE

OPINION BY
JUDGE ROSSIE D. ALSTON, JR.
SEPTEMBER 9, 2014

FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

Patricia C. Arrighi (PennStuart, on brief), for appellants.

Gregory O. Harbison (Harbison & Kavanagh, PLLC, on brief), for appellee.

United Parcel Service, Inc. ("employer") and Liberty Insurance Corporation appeal a decision of the Workers' Compensation Commission ("the commission") awarding Kirk V. Prince ("claimant") benefits. Employer argues that the commission erred when it reversed the finding by the deputy commissioner and awarded benefits to claimant for post-traumatic stress disorder ("PTSD"). Finding no error, we affirm.

I. Background

"'On appeal from a decision of the [commission], the evidence and all reasonable inferences that may be drawn from that evidence are viewed in the light most favorable to the party prevailing below.'" Snyder v. City of Richmond Police Dep't, 62 Va. App. 405, 408, 748 S.E.2d 650, 652 (2013) (quoting Artis v. Ottenberg's Bakers, Inc., 45 Va. App. 72, 83, 608 S.E.2d 512, 517 (2005) (en banc)). So viewed, the evidence indicated that on January 7, 2013, claimant, a forty-two-year-old at the time who had been working for employer since 1995, specifically as a delivery driver for twelve years, arrived at Barbara Fassett's home to deliver a

package and found her lying on the ground with blood on her face. It was later determined that Ms. Fassett had sustained a fatal gunshot wound to her face. Claimant filed his claim for benefits on February 6, 2013, alleging a compensable injury (PTSD) by accident from the circumstances associated with having observed the gruesome scene of the January homicide. Claimant sought a medical award and temporary total disability benefits from January 10, 2013, through June 2, 2013, based upon an average weekly wage of $1,545.48. Employer defended the claim on the grounds that the incident did not qualify as a compensable injury by accident that arose out of claimant's employment and that claimant failed to market his remaining work capacity.[1]

At the hearing before the deputy commissioner on May 23, 2013, claimant testified that he had been making deliveries to Ms. Fassett's home two to three times a week for approximately ten years and had developed a good relationship with her. Around 5:30 p.m. on January 7, 2013, claimant arrived at Ms. Fassett's home to make a regular delivery and as he walked towards the house, he noticed glass on the porch and saw a woman lying in the doorway of the house. As claimant moved closer to the woman and yelled out to ask if she was okay, he noticed that "she was covered in blood over the face" at which point claimant backed away and dialed 911.

Claimant testified that he recognized the victim as Ms. Fassett and described what he witnessed as a "really really gruesome scene." Specifically, claimant observed blood on Ms. Fassett's face and the bottom part of her mouth. In claimant's recorded interview taken seven days after the incident on January 14, 2013, claimant stated that "I thought she had passed out - I proceeded to look inside at her and she had been shot several times." In his recorded interview, claimant was asked if "there [was] any visible evidence as [he] walked up to the door

_____

[1] The failure to market remaining work capacity issue is not before this Court on appeal.

- 2 -

that there might have been a situation that had happened [at Ms. Fassett's house]?" Claimant responded:

> Yeah – I thought – the glass to the screen door had been broken and I thought she had fall – my initial – um – assessment was that she had fell or something like that – or she may have passed out or something – I did not notice what had happened until I got closer to her.

Claimant stated that as he moved closer, when he looked at Ms. Fassett's face, he could tell she had "shrapnel and bullet wounds in her face and her face was pretty much gone – it was all bloody." At that point claimant called 911. Claimant testified that he:

> felt sorrow because [he] knew her, . . . [he knew] all [his] customers and [he] just had never seen anyone besides in the funeral home that had been deceased. And [he] just felt a sickening feeling in [his] stomach and [he] didn't know how to comprehend how [he] was feeling at the time.

When asked why he feared for his life, claimant testified: "Once I saw the, the glass and I saw the, the light on, like someone had just left the premises, or someone had just went into the house, I, . . . just made assessment that, you know, it's, it was foul play or miss [sic]."

Claimant had not heard any radio reports of a crime being committed on the way to Ms. Fassett's nor heard any gunshots before he arrived. Additionally, he had never taken a training course through UPS as to what to do or how to prepare for witnessing scenes of violence while on the job. Claimant testified that he made 150 deliveries a day on average and had never before seen any customers at their home covered in blood. After witnessing Ms. Fassett's body for approximately five or ten seconds, claimant called 911 and then his supervisor.

The audio of claimant's 911 call was admitted into the record and played at the hearing. In the audio, claimant stated that Ms. Fassett was not breathing, had blood on her mouth and nose, and that he believed there had been foul play. Claimant declined to attempt to perform CPR, stating that he did not know whether the person who had done this was still in the house.

Claimant testified that he cried at the scene "pretty much right after [he] saw [Ms. Fassett]" and that "the longer [he] was there, the more upset [he] got." Claimant further testified that he vomited while waiting for 911 responders because he "felt nauseating [sic] and overwhelmed." Claimant testified that he was at the scene for approximately an hour waiting for police responders and to be interviewed. After police arrived and entered the house, claimant learned that there was another dead body, Ms. Fassett's daughter, inside the house and claimant stated that this news made him feel even worse.

Claimant had seven more deliveries to make that day but he did not make them because he was "too upset" and could not drive. Claimant was driven back to the UPS terminal by a supervisor. Claimant testified that he did not sleep that night because he "was in fear" and "mourning for Ms. Fassett and her daughter" and "didn't feel safe in [his] own home, from what [he] saw."

Employer's doctor evaluated claimant the following day and diagnosed him with "situational anxiety" and recommended counseling and prescribed Xanax. From January through March, claimant experienced sleep problems, flashbacks, fear at night or while being out in public, and not feeling safe at home. Claimant began treatment at Adolescent and Family Health Center where he was diagnosed with PTSD. Mr. Stan Tebbe, LPC, restricted claimant from working as a result of his diagnosis by letter dated January 10, 2013. Dr. George Bright, M.D., also of Adolescent and Family Health Center, confirmed claimant's PTSD diagnosis and sleep disturbance as a result of his trauma and noted that claimant was on Abilify and Lunesta to help him sleep and continuing counseling with Mr. Stebbe. Claimant testified that he planned to return to work at UPS on June 3, 2013.

The deputy commissioner issued his opinion on July 23, 2013, finding that claimant adequately marketed his residual earning capacity but that claimant's condition did not constitute

a compensable injury by accident. Claimant requested review by the full commission on August 1, 2013. On December 17, 2013, the full commission issued its opinion reversing the deputy commissioner and holding that the "sight of [claimant's] murdered customer was so shocking, frightening, traumatic, catastrophic, and unexpected as to comprise a compensable injury by accident . . . ." The commission further found that

> [C]laimant experienced an obvious sudden shock or fright sufficient to constitute an injury by accident producing a psychological injury. The events of January 7, 2013 were wholly outside the reasonable expectations of the claimant's work day. . . . It was the claimant's job to deliver packages. He did not volunteer or expect to find the murdered woman.

This appeal followed.

## II. Analysis

Employer argues that claimant's brief observation of Ms. Fassett's body was insufficient to constitute a "sudden shock or fright" so as to constitute a compensable injury by accident.

"On appeal, factual findings of the commission will not be disturbed if based on credible evidence." Anthony v. Fairfax Cnty. Dep't of Family Servs., 36 Va. App. 98, 103, 548 S.E.2d 273, 275 (2001) (citing Morris v. Badger Powhatan/Figgie Int'l, Inc., 3 Va. App. 276, 279, 348 S.E.2d 876, 877 (1986)). "Causation is a factual determination to be made by the commission, but the standards required to prove causation and whether the evidence is sufficient to meet those standards are legal issues which we must determine." Id. at 103, 548 S.E.2d at 276 (citing Morris v. Morris, 238 Va. 578, 385 S.E.2d 858 (1989)).

A claimant may recover workers' compensation benefits for a purely psychological injury, provided the injury is causally related to a sudden shock or fright arising out of the course

of the claimant's employment.[2]  In one of the first cases awarding benefits for a psychological

injury, Burlington Mills v. Hagood, 177 Va. 204, 206, 211, 13 S.E.2d 291, 291, 294 (1941), the

Supreme Court of Virginia affirmed the then Industrial Commission's award of benefits to a

claimant who thought she had been electrocuted when a motor short-circuited, causing a flash

which frightened claimant.  The Supreme Court held that because the claimant's psychological

injury was traced to a risk that arose out of her employment and there was a direct causal relation

between the short-circuit flash and claimant's psychological injury, the commission did not err in

awarding claimant benefits.  Id. at 211, 13 S.E.2d at 293-94.  This Court later applied the

principle that a claimant may recover for a psychological injury and clarified that "[t]o be

compensable as an injury by accident, a purely psychological injury must be causally related to a

physical injury or be causally related to an obvious sudden shock or fright arising in the course

of employment."  Chesterfield Cnty. v. Dunn, 9 Va. App. 475, 477, 389 S.E.2d 180, 182 (1990)

(citing Hagood, 177 Va. at 210-11, 13 S.E.2d at 293-94) (claimant firefighter and emergency

medical technician not entitled to benefits for a psychological injury allegedly caused by

attending to a severely injured motorist after an automobile accident because the situation was an

expected occurrence in claimant's occupation).

---

[2] See, e.g., Daniel Const. Co. v. Tolley, 24 Va. App. 70, 480 S.E.2d 145 (1997)
(explosion of 100 pounds of dynamite without warning while claimant was unloading concrete in
a mine shaft nearby was deemed sufficient); Hercules v. Gunther, 13 Va. App. 357, 412 S.E.2d
185 (1991) (claimant, who was propelled through air in an explosion that killed coworkers, was
entitled to benefits).  While its decisions are not binding authority on this Court, we note that the
commission has likewise held that a claimant may recover for purely psychological injuries.
See, e.g., Tucker v. A&G Coal Co., VWC File No. 190-92-66 (July 16, 1999) (claimant who was
on runaway motor grader rolling down a steep road and had to jump off to safety suffered a
"truly life or death situation" that was sufficient to "shock the conscience" and the commission
awarded benefits); Trent v. Cent. Va. Training Ctr., VWC File No. 165-64-70 (Sept. 12, 1994)
(shot fired near unarmed security guard left claimant with "profound feelings of vulnerability,
threat and helplessness"); Dudley v. Norfolk Airport Auth., VWC File No. 141-48-81 (Jan. 19,
1994) (post-traumatic stress disorder resulted from work-related robbery).

In Anthony, 36 Va. App. at 103-04, 548 S.E.2d at 276, this Court refined the "shock or fright" component of a compensable psychological injury by noting that "[t]he types of precipitating events that give rise to purely psychological compensable injuries are consistently described as shocking, frightening, traumatic, catastrophic, and unexpected." In Anthony, the claimant therein was a social worker for the Fairfax County Department of Family Services and her duties included field contacts with clients and implementation of court orders, including removing children from their homes. Id. at 100, 548 S.E.2d at 274. During one incident giving rise to her claim, claimant conducted a home visit of a client, which resulted in the client physically pulling claimant from a chair and throwing her out of the house. During a separate incident one year later in a visit to a daycare center to take emergency custody of two children, the mother and grandmother of the children pushed claimant to the ground. Id. at 100-01, 548 S.E.2d at 274. Claimant filed a claim for benefits related to both physical and psychological injuries and testified that she was "terrified" after the second altercation and that she became more afraid of going out in the field, that she had trouble sleeping, became more angry, lost weight, and that the incident affected her relationships with other staff members. Id. at 101, 548 S.E.2d at 275. A psychologist with the employee assistance program diagnosed claimant with PTSD; however, a psychiatrist retained by employer found no evidence of PTSD. Id.

The deputy commissioner found that while claimant did not suffer any new physical injuries in the second confrontation, the incident did cause PTSD. Id. at 102, 548 S.E.2d at 275. The full commission reversed. In affirming the commission, this Court upheld the commission's findings regarding the employer-retained psychiatrist's characterization of the types of events that meet the criteria for PTSD as: "Life threatening events, being held hostage, being held at gunpoint, being subject to some unexpected catastrophe like a severe automobile accident [or] a plane crash. And the word unexpected is very important because in the normal range of

- 7 -

activities, we kind of expect certain things to happen." Id. at 104, 548 S.E.2d at 276. The

employer's psychiatrist further opined that one of the factors mitigating claimant's diagnosis of

PTSD was that what happened to her was not "out of the range of experience of a social worker

in Child Protective Services." Id. Accordingly, this Court held that credible evidence supported

the commission's determination that the events of the second altercation did not "rise to the level

of the type of sudden shock or fright from which a compensable injury may arise." Id. at 105,

548 S.E.2d at 277.

In the present case, there is ample credible evidence in the record to support the

commission's award of benefits based on claimant's PTSD resulting from his encounter with the

dead body of a longtime customer on the job. Employer cites to the commission's decision in

Larkin v. Thalia Gardens Apartments, VWC File No. 238-20-16 (Mar. 26, 2010), in support of

its position[3]; however, the facts of that case are clearly distinguishable from the facts of the

present case.[4] The uncontroverted evidence is that claimant obviously stumbled on a completely

---

[3] The commission's analysis in Larkin certainly is not binding on this Court.

[4] In Larkin, the commission reversed the deputy commissioner's award of benefits to a claimant who saw her coworker lying on the ground after she had been shot. Claimant heard six loud bangs and then received a call from a coworker saying that her other coworker had been shot. Claimant then drove over to the location of the shooting and observed her injured coworker lying on the ground. Claimant was later diagnosed with PTSD. The commission, citing Curry v. Consol. Energy, Inc., Record No. 1747-07-3, 2008 Va. App. LEXIS 145 (Va. Ct. App. Mar. 25, 2008), relied on the facts that claimant was not present when the shooting occurred and testified that she thought the sound was a blown generator, she was notified by a coworker that the decedent had been shot prior to her arrival on the scene, and that claimant was not required to be present at the shooting scene as part of her employment to hold that claimant did not suffer a compensable psychological injury.
    In Curry, claimant's coworker was fatally injured when he became caught in a conveyor belt line of a rock crusher tailpiece. 2008 Va. App. LEXIS 145, at *2-3. Claimant did not witness the accident but was told about it, arrived shortly after it occurred, and assisted with the removal of his friend's remains from the machine. Id. The commission denied the claimant benefits, finding that claimant did not suffer from PTSD based upon the employer's medical evidence, which disputed claimant's assertion that he suffered from PTSD. Id. at *5-6. This Court affirmed, holding that the commission did not err in resolving the conflicting medical

- 8 -

unexpected, horrific and terrifying sight.[5]  He described the horror as a "really really gruesome scene."  Specifically, claimant observed blood on Ms. Fassett's face and the bottom part of her mouth.  Claimant further stated that when he looked at Ms. Fassett's face he could tell she had "shrapnel and bullet wounds in her face and her face was pretty much gone – it was all bloody."  Claimant's shock was evident immediately as he testified that he cried at the scene "pretty much right after [he] saw [Ms. Fassett]" and that he vomited while waiting for 911 responders because he "felt nauseat[ed] and overwhelmed."

Additionally, unlike the claimant in Anthony where claimant's confrontations with clients were not surprising in the course of her job, claimant unexpectedly came across Ms. Fassett's body while in the course of his job duties.  Claimant did not hear any radio reports of crime on the way to Ms. Fassett's house or hear any gunshots before he arrived.  He did not have a training course through UPS on how to prepare for or react to witnessing scenes of violence while on the job and out of approximately 150 deliveries a day on average, claimant had never before seen any customers at their home covered in blood.  Claimant was clearly frightened and felt like he was in a life or death situation.  Indeed he testified that he "was feeling fear because [he] knew something bad had happened, but [he] didn't know . . . who had did it and . . . exactly where the person was that did it, so [he] was fearing for [his] life actually."

---

evidence in favor of the employer.  Id. at *7.  Because the Court affirmed the commission's finding that claimant did not actually suffer from PTSD, it did not reach the issue of whether the precipitating event was sufficiently shocking or frightening to cause a compensable psychological injury.

The commission's reliance on Curry in deciding whether the claimant in Larkin suffered a sufficiently shocking or frightening event, despite the fact that the court did not reach that issue in Curry, is inapposite to this case.  The gruesome facts of this case are clearly distinguishable from both Larkin and Curry.

[5] We also note that unlike the evidence before the commission in Anthony and Curry, in this case the medical evidence of claimant's PTSD diagnosis was not contradicted.

Employer places great emphasis on the fact that claimant only looked at Ms. Fassett's body for five to ten seconds before retreating and calling 911. We note that neither the Supreme Court nor this Court has developed a temporal component or standard for how long a claimant must witness a scene for it to constitute a sufficiently shocking or frightening event, and we decline to do so in this case. Regardless of the length of time claimant looked at Ms. Fassett's face, it was long enough to determine that it was bloodied and "pretty much gone . . . ." Furthermore, claimant remained at the scene for approximately an hour after the police arrived and during that time was told that there was another dead body in the house. The entire incident, during which claimant remained in shock, crying, and vomiting, lasted over an hour.

Finally, employer argues that the commission erred by taking into account details not known by claimant when he initially witnessed the scene (such as the fact that there was a second dead body inside the house, which he only learned after the police arrived). The commission's opinion makes no mention of such details. While claimant learned from the police while at the scene that there was a second dead body inside the home, it does not diminish the initial shock associated with unexpectedly stumbling across *one* dead body. The commission based its determination on claimant's testimony describing the scene he witnessed and the 911 recording in concluding that claimant observed a sufficiently shocking and frightening scene. The facts set forth in claimant's testimony and the 911 call all centered on claimant's observations of Ms. Fassett's body immediately when he came across it and in the seconds and minutes following his discovery.

For these reasons, we hold that the commission did not err in determining that claimant suffered a compensable psychological injury and that he was therefore entitled to an award of benefits.

Affirmed.