HUMPHREYS, Judge.
Ottenberg’s Bakers, Inc. (“employer”) discharged appellant Phillip L. Artis for cause after Artis staged a robbery in an attempt to murder a co-worker. Following his termination, Artis filed a claim with the Workers’ Compensation Commission, seeking temporary partial disability benefits. The commission denied Artis’ claim, reasoning that Artis had forfeited his right to temporary disability benefits because his termination was attributable to his volitional misconduct rather than his disability. On appeal, Artis contends that the commission erred in denying his claim because the misconduct resulting in his termination was, in turn, caused by his compensable psychiatric disorder. For the reasons that follow, we *77 affirm the commission’s denial of temporary partial disability benefits.
I. BACKGROUND
Artis was formerly employed as a route salesman for employer, a position requiring Artis to drive a bakery delivery truck in and around the Washington metropolitan area. On October 2, 1999, Artis was driving a delivery truck along Interstate 66 in Fairfax County while en route to one of employer’s customers. At approximately 3:45 a.m., Artis came upon an apparent “road rage” incident on the interstate. Several people involved in the incident got out of their vehicles and ran across the highway in front of Artis’ truck. The last person attempting to cross the highway darted directly in the path of the truck. Although Artis tried to avoid hitting that individual, he was unable to do so, striking and killing the pedestrian.
Artis, who was in a “daze” and hyperventilating after the accident, called employer to report the incident. Artis told his manager that he was too distraught to finish the shift, but the manager informed him that Artis had to complete the delivery route because employer did not have any other employees who could replace him. Artis finished his route, completed his paperwork, and drove himself home.
Two days later, Artis went to the Providence Hospital Wellness Institute, seeking medical treatment for back pain. He was diagnosed with thoracic strain and excused from work through October 10, 1999. On October 11, Artis returned to the Wellness Institute for a follow-up evaluation. Artis reported that he was unable to drive and was suffering from emotional distress because of the accident.
On October 12, 1999, Dr. Cecil Harris, a clinical psychologist, evaluated Artis’ mental condition. Artis told Dr. Harris that, after the accident, he began to experience flashbacks, fearing “that it would happen again” and that he would be “thought of as a killer.” Those feelings caused Artis to experience “depression to the point ... [he] was suicidal.” *78 Artis had also developed a fear of driving and crossing the street, occasionally suffered from anxiety attacks, had trouble sleeping and getting out of bed, and had experienced problems maintaining an erection. Artis additionally told Dr. Harris that, three years earlier, he had received psychological treatment for “rage.”
Dr. Harris found that Artis’ initial mental examination “revealed a nervous, tense/anxious, depressed, agitated, phobic male who was fully oriented with sad, hopeless, and depressed affect, and depressed/irritable mood,” and who “denied suicidal and homicidal ideation and was having trouble containing paranoid, hostile, and violent urges secondary to his anxious, agitated feelings.” Dr. Harris diagnosed Artis as suffering from post-traumatic stress disorder (“PTSD”) and “Adjustment Disorder with Mixed Anxiety and Depressed Mood,” and he initiated a “treatment plan of twice weekly, or as needed psychotherapy.” As part of his treatment, Artis also took Zyprexa, an anti-depressant. Dr. Harris additionally recommended that, when Artis returned to work, he should initially ride with another driver, then have another driver with him, and, ultimately, drive by himself “when ready.”
Thus, when Artis returned to work on October 25, 1999, he assumed a selective duty capacity. He began riding along with other drivers, and he later began to drive by himself, sometimes accompanied by a co-driver. By at least January of 2000, Artis “was returned to full duty with the stipulation if [he] need[ed] help, [he could] ask the night manager and [help] would be provided.” According to Artis, the night manager “refused on a few occasions” to provide him with the requested help.
Artis continued to undergo “generally weekly and sometimes bi-weekly” counseling sessions with Dr. Harris through July 2000. During these sessions, Artis reported continuing feelings of rage and depression. Artis still experienced occasional flashbacks, and he was having trouble sleeping. Artis also believed that employer was not supportive of his recovery efforts, and he felt that employer was deliberately trying to *79 get him to leave the company by, for example, denying him a ride-along helper.
After a few months of counseling with Dr. Harris, Artis’ psychological condition seemed to be improving. However, on May 4, 2000, employer re-assigned Artis to the route he was driving in October 1999 when he struck and killed the pedestrian. At that point, Artis’ psychological condition began to deteriorate, causing him to experience suicidal and homicidal tendencies.
In response to Artis’ re-assignment to his former route, Dr. Harris wrote a letter to William Walker, employer’s human resources manager. Dr. Harris informed Walker that Artis was “greatly stressed and somewhat regressed,” presumably because he had been “scheduled to service the route where his accident occurred on October 2, 1999.” Dr. Harris further indicated that, although Artis “has made much progress in his therapy and his rehabilitation is progressing well,” Artis “is clinically not ready to service that particular route at this time.” Dr. Harris concluded that “[i]t is important that we continue to work closely together towards supporting [Artis’] full recovery.” Employer, however, did not re-assign Artis to a different route.
By the beginning of June 2000, Artis was still experiencing homicidal and suicidal tendencies, but he informed Dr. Harris that he was “coping [with the] new route,” and had developed sufficient “confidence to move forward now [without] a rider.” On June 14, however, Artis told Dr. Harris that, although he had recently been given a ride-along helper, the dispatcher had informed Artis that “there would be no new approval for a new rider.” Dr. Harris told Artis that he would write or call employer regarding Artis’”need for a rider from time to time.” Artis later testified that, at that point, he blamed Walker for denying him a “ride along helper,” and he believed Walker was “operating to get [him] out of the company.”
On June 29, 2000, Artis “faked” a robbery of the delivery truck he was driving, and he filed a false police report indicating that he had been robbed of “[b]etween two and *80 three hundred” dollars. Artis staged the robbery because he expected Walker to respond to the scene of the reported robbery, at which time he intended to kill Walker. Artis later testified that his intent was “to do the same harm [to Walker that Walker] was doing to my family.” He wanted to “get even” because he felt that Walker failed to adequately respond to Artis’ difficulties in performing his job. Artis also testified that he staged the robbery attempt because “the bills were mounting” and he was having difficulty with child support.
About an hour after the staged robbery, Artis was arrested, and he pled guilty to the charge of filing a false police report. After his arrest, employer fired Artis because of his misconduct.
On October 2, 2001, Artis filed a claim for benefits arising out of the accident of October 2, 1999. Artis alleged that he “injured his back and suffered psychological injuries, including post-traumatic stress disorder as a direct result” of the compensable accident. Artis sought medical benefits, an award of temporary total disability from October 2, 1999 through December 17, 1999, and temporary partial disability compensation for various periods following the termination of his employment.
At the hearing before the deputy commissioner, employer stipulated that, in October 1999, Artis experienced a compensable accident arising out of and in the course of his employment. Employer also acknowledged that there was some injury to claimant’s back and some psychological injury resulting from that accident. Employer further agreed that some compensation was voluntarily paid and that “psychiatric treatment [was] authorized and paid for at least up until a certain point.” Employer defended the claim on the grounds that Artis was not disabled in the nature or to the extent alleged, that there was no causal relationship between the injury and the subsequent periods of disability, and that Artis was not entitled to any partial disability benefits after he was terminated for cause.
*81 Artis contended, however, that he was entitled to post-termination temporary partial disability benefits because the misconduct that led to his termination was caused by his compensable disability. As proof of causation, Artis introduced a letter, dated July 18, 2000, that Dr. Harris had sent to Artis’ union president. In this letter, Dr. Harris summarized Artis’ diagnosis and treatment for PTSD, concluding that, “Artis discussed in detail the incident of 06/29/00 in therapy. It is my opinion, based on the information I have, that Artis’ involvement in this incident is related to his diagnosis.”
Artis also introduced Dr. Harris’ response to a letter from Artis’ counsel, dated September 24, 2002. In this questionnaire, when asked to explain the basis for his conclusion that the “feigned robbery resulted directly from [claimant’s] accident-related psychiatric condition,” Harris responded:
I still hold the opinion that the feigned robbery of 06/29/00 resulted directly from [ ] Artis’[ ] accident-related psychiatric condition. Mr. Artis was still actively traumatized by his 10/02/99 fatality, on 06/29/00. He was also frustrated, angry, fearful and problem-solving very poorly at that time. He was sleep deprived [with] suicidal ideation as well. In his mind this was not an act of robbery, but one of symbolically regaining his loss of control.
The deputy commissioner found that Artis “experienced a compensable injury by accident on October 2,1999, as alleged, resulting primarily in a post-traumatic stress disorder.” The deputy commissioner also determined that “claimant carried his burden of proving entitlement to temporary [total] disability compensation from October 4, 1999, through October 10, 1999.” The deputy commission further held, however,
that the employer’s termination of the claimant on June 29, 2000, based upon his fabrication of a robbery and the filing of a false police report, was for justified cause sufficient to permanently bar the claimant’s entitlement to partial wage loss compensation thereafter.... We further conclude that the claimant’s wage loss after June 29, 2000, is properly attributable to his own conduct, and not to any disability *82 resulting from the October 2, 1999 injury by accident. We reach this conclusion notwithstanding Dr. Harris’ opinion that on June 29, 2000, the claimant remained “actively traumatized” by the events of October 2, 1999, and that his action in feigning the robbery attempt was “one of symbolically regaining his loss of control.” To the extent the claimant then felt pressured by. the employer to resume his normal work activities, a conclusion we doubt based upon our assessment of the claimant’s credibility, the claimant had various other options available to him other than feigning a robbery so that he might attempt a murder.
(Emphasis added.)
Artis appealed the deputy commissioner’s decision to the full commission. The commission affirmed, finding:
The evidence in this case establishes that the claimant was under some restrictions at the time of his discharge. He was discharged after he feigned a robbery with the intent to harm an individual employed by the employer. Dr. Harris implicated a variety of factors which led to this behavior, including the claimant’s frustration and anger. A close review of Dr. Harris’[] contemporaneous treatment notes, as well as the claimant’s testimony, demonstrates that the claimant’s main problems were not directly related to his accident. The claimant’s problems involved anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma. These problems are of a nature more akin to stress resulting from an employee’s interaction with his supervisors, which is not compensable. See Teasley v. Montgomery Ward & Co., 14 Va.App. 45, 415 S.E.2d 596 (1992). We also note that the documentary [evidence] reveals pre-existing problems with anger or “rage,” despite the claimant’s denials to the contrary.
We find that the totality of the evidence shows that the claimant was responsible for his wrongful actions on June 29, 2000. Under the circumstances presented, we agree *83 that the claimant was discharged for justified cause, supporting the forfeiture of benefits.
Artis appealed this decision to this Court. By opinion dated June 1, 2004, a panel of this Court, with one judge dissenting, reversed the commission, concluding that “there is no credible evidence in the record to support the commission’s finding that claimant was discharged from selective employment for reasons unrelated to his compensable work-related accident.” Artis v. Ottenberg’s Bakers, Inc., 43 Va.App. 137, 157, 596 S.E.2d 547, 557 (2004), Accordingly, the panel remanded this case to the commission “for the purpose of calculating the amount of claimant’s post-termination workers’ compensation benefits.” Id. at 164, 596 S.E.2d at 560-61.
We granted employer’s petition for rehearing en banc, stayed the mandate of the panel decision, and reinstated the appeal. Upon rehearing en banc, we affirm the commission’s denial of benefits.
II. ANALYSIS
The sole issue on appeal is whether the commission erred in concluding that Artis’ misconduct justified a forfeiture of his disability benefits. Artis argues that his misconduct did not justify forfeiture because it was caused by his compensable disability. We, however, agree with employer that there is credible evidence in the record supporting the commission’s determination that Artis’ termination was attributable to his wrongful, volitional conduct rather than his disability.
On appeal from a decision of the Workers’ Compensation Commission, the evidence and all reasonable inferences that may be drawn from that evidence are viewed in the light most favorable to the party prevailing below. Clinchfield Coal Co. v. Reed, 40 Va.App. 69, 72, 577 S.E.2d 538, 539 (2003); Tomes v. James City (County of) Fire, 39 Va.App. 424, 429, 573 S.E.2d 312, 315 (2002). Also, “[w]e do not judge the credibility of witnesses or weigh the evidence on appeal.” Celanese Fibers Co. v. Johnson, 229 Va. 117, 121, 326 S.E.2d 687, 690 (1985). Rather, we are bound by the commission’s *84 findings of fact as long as “there was credible evidence presented such that a reasonable mind could conclude that the fact in issue was proved,” Westmoreland Coal Co. v. Campbell, 7 Va.App. 217, 222, 372 S.E.2d 411, 415 (1988) (emphasis in original), even if there is evidence in the record that would support a contrary finding. Morris v. Badger Powhatan/Figgie Int’l, Inc., 3 Va.App. 276, 279, 348 S.E.2d 876, 877 (1986); Russell Loungewear v. Gray, 2 Va.App. 90, 95, 341 S.E.2d 824, 826 (1986).
It is well settled that, “where a disabled employee is terminated for cause from selective employment procured or offered by his employer, any subsequent wage loss is properly attributable to his wrongful act rather than his disability.” Chesapeake & Potomac Telephone Co. v. Murphy, 12 Va.App. 633, 639-40, 406 S.E.2d 190,193, ajfd en banc, 13 Va.App. 304, 411 S.E.2d 444 (1991). Thus, an employee “who is terminated for cause and for reasons not concerning his disability is not entitled to receive compensation benefits.” Id. at 637, 406 S.E.2d at 192 (discussing Goodyear Tire & Rubber Co. v. Watson, 219 Va. 830, 252 S.E.2d 310 (1979)); see also Potomac Edison Co. v. Cash, 18 Va.App. 629, 631, 446 S.E.2d 155, 157 (1994) (“Under the Act, an employee who is properly terminated from selective employment procured by the employer for cause consisting of willful misconduct forfeits his or her entitlement to future temporary partial disability benefits.”).
As we have noted,
“A justified discharge ... does not simply mean that the employer can identify or assign a reason attributable to the employee as the cause for his or her being discharged. Whether the reason[ ] for the discharge is for cause, or is justified for purposes of forfeiting benefits must be determined in the context of the purpose of the Act and whether the conduct is of such a nature that it warrants permanent forfeiture of those rights and benefits.”
Walter Reed Convalescent Ctr. v. Reese, 24 Va.App. 328, 336, 482 S.E.2d 92, 96-97 (1997) (quoting Eppling v. Schultz Dining Programs, 18 Va.App. 125, 128, 442 S.E.2d 219, 221 (1994)) *85 (alteration and omission in original) (internal quotations omitted) (emphasis added).
Also, it is not necessary to prove “that the employee’s wrongful act was intentional, willful, or deliberate in order to justify a termination for cause and a forfeiture of compensation benefits.” Reese, 24 Va.App. at 336-87, 482 S.E.2d at 97. Rather, all that is required is a showing: (1) that the wage loss is “properly attributable” to the wrongful act; and (2) that the employee is “responsible” for that wrongful act. Id, at 336, 482 S.E.2d at 97 (“ ‘In order to work a forfeiture, the wage loss [must be] properly attributable to [the employee’s] wrongful act ... for which the employee is responsible.’ ” (quoting Eppling, 18 Va.App. at 129, 442 S.E.2d at 222 (alterations and omission in original) (internal quotations omitted))).
A. Whether Artis’ Termination Was “Attributable” to His Misconduct
In determining whether a claimant’s termination was “attributable” to the claimant’s wrongful act, the overriding inquiry is as follows: Was the claimant fired because of his disability, or was he fired because of his misconduct?[1] In *86 making this determination, the commission should “consider the nature of [the] conduct” alleged to justify the dismissal. Eppling, 18 Va.App. at 129, 442 S.E.2d at 221. Ultimately, the burden of proof is on the claimant to demonstrate that his termination was attributable to his disability rather than his wrongful act. See Washington Metro. Area Transit Auth. v. Harrison, 228 Va. 598, 600-02, 324 S.E.2d 654, 655-56 (1985) (holding that claimant who had no previous disability award entered in his favor had the burden to prove that he was entitled to temporary total disability benefits following termination of employment).
Here, then, we must consider whether Artis was fired because of his disability (e.g., because his disability prevented him from adequately performing his duties), or whether he was fired for another reason entirely. The commission found that Artis failed to carry his burden of proving that his termination was attributable to his disability, concluding that Artis was discharged not because of his disability, but because he became angry with employer and, as a result, “feigned a robbery with the intent to harm an individual employed by the employer.” There is credible evidence in the record supporting this conclusion.
Specifically, the record indicates that Artis had been performing his full duties and receiving fall wages for at least six months preceding the staged robbery. Also, Artis was not fired because, for example, his disability rendered him unable to drive certain routes or perform the physical duties required by his job. See, e.g., Watson, 219 Va. at 833, 252 S.E.2d at 312-13 (holding that, where the claimant failed to “make any claim that [his] job ... was too difficult for him to perform because of his [ ] injury ... it cannot be inferred from any evidence in the record that [he] was discharged as a result of his [] injury”). As noted by the deputy commissioner, employer “had modified [Artis’] activities as of his return to work *87 to accommodate the continuing effects of his diagnosed post-traumatic stress disorder,” and Artis “was at least some times provided an assistant and permitted to avoid driving his normal pre-injury route.” Rather than being fired because he demanded an assistant or did not wish to drive his “normal” route, it is uncontradicted that Artis was fired because he staged a robbery, misappropriating between $200 and $300 of the employer’s funds, with the intent of murdering his supervisor once he arrived at the scene.
Additionally, the “nature of [the] conduct” resulting in Artis’ dismissal, Eppling, 18 Va.App. at 129, 442 S.E.2d at 221, certainly justifies a forfeiture of temporary partial disability benefits. Artis himself testified that he acted with premeditation, and with knowledge of his actions and the consequences of those actions. Attempted homicide constitutes precisely the type of “wrongful act” that should “justif[y]” a forfeiture of compensation benefits. Murphy, 12 Va.App. at 639, 406 S.E.2d at 193; cf. Watson, 219 Va. at 833, 252 S.E.2d at 313 (holding that a partially disabled employee’s benefits were properly terminated when the employee was discharged because he had been “an exceedingly poor worker during the entire period of his employment ... he had a great number of absences from work, and ... several times he left his job without authorization”); Marval Poultry Co. v. Johnson, 224 Va. 597, 598, 299 S.E.2d 343, 344 (1983) (holding that a disabled employee on selective work status was no longer entitled to workers’ compensation benefits when “he [was] discharged by his employer for dishonesty”); Murphy, 12 Va.App. at 639, 406 S.E.2d at 193 (holding that an employee’s conduct constituted “cause” for discharge, justifying a forfeiture of benefits, where he was guilty of fraudulent misrepresentations in his attempt to obtain compensation benefits); Richfood, Inc. v. Williams, 20 Va.App. 404, 410, 457 S.E.2d 417, 420 (1995) (“Where passing drug and alcohol screening is made a clear and unequivocal condition of employment, ... failure to pass the screening is tantamount to misconduct ... for which an employee can be terminated.”).
*88 Artis contends, however, that the commission erred in determining that his termination was not attributable to his disability because his disability caused the misconduct that, in turn, caused his termination. Initially, we note that the critical inquiry here is not whether there is a causal relationship between the disability and the claimant’s misconduct. Rather, we are concerned with the relationship between the disability and the claimant’s termination.
Regardless, we decline Artis’ implicit offer to recognize a rule that would permit a claimant to show that he is entitled to post-termination benefits because, in an “unbroken chain of events,” his disability was a contributing cause of the misconduct resulting in his termination. Because such a rule would inevitably lead to absurd results, we hold instead that there must be an immediate, proximate nexus between the disability and the termination for the termination to be deemed “attributable to” the disability.[2]
As the commission correctly found, that immediate nexus is lacking here: Artis was discharged because he staged a robbery, not because he was disabled. Thus, there is not, as Artis contends, an “unbroken chain of events” between Artis’ compensable disability and his termination. Rather, Artis’ own willful, volitional misconduct constitutes an intervening cause sufficient to break that chain of causation.
Moreover, the commission expressly rejected Artis’ contention that his psychiatric condition directly caused his misconduct, finding instead that Artis’ misconduct was caused by “anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems *89 with accommodations and other employment issues not directly related to the initial trauma.” This conclusion is supported by credible evidence in the record. Specifically, the record indicates that, despite having been paid full wages for at least six months, Artis’ “bills were mounting,” and he was having difficulty paying for child support. Also, Artis had experienced previous problems with “rage,” and he was becoming increasingly angry with his employer for re-assigning him to a route that he (understandably) did not wish to drive. Thus, credible evidence in the record supports the commission’s conclusion that Artis’ misconduct was caused by stress “resulting from [his] interaction with his supervisors,” not his psychiatric condition or its residual effects.[3]
We also reject Artis’ argument that our decision in Food Distributors v. Estate of Ball, 24 Va.App. 692, 485 S.E.2d 155 (1997), compels a different result. In Estate of Ball, the decedent suffered a job-related, compensable injury. Id. at 695, 485 S.E.2d at 157. Following the injury, the decedent was “unable to work full time or to engage in simple, repetitive tasks.” Id. As a result, he fell into a depression and ultimately committed suicide. Id. at 695-96, 485 S.E.2d at 157. The decedent’s widow filed a claim for benefits, contending that the decedent’s suicide was caused by his earlier, job-related injury. Id. at 696, 485 S.E.2d at 157. The employer, however, citing to Code § 65.2-306(A)(1),[4] argued that “the commission erred in awarding benefits to claimant because *90 decedent’s suicide was an independent and willful act that barred compensation.” Id. at 697, 485 S.E.2d at 158. We affirmed the commission’s award of benefits, holding that the record contained credible evidence indicating that the suicide was causally related to the earlier injury. Id. at 703-06, 485 S.E.2d at 161-62.
Estate of Ball is, however, inapposite to this case for three reasons. First and foremost, Estate of Ball concerned the doctrine of compensable consequences rather than the termination for cause doctrine. The doctrine of compensable consequences, also known as the chain of causation rule, is applicable when a claimant asserts that a subsequent injury should be compensable because it was “caused by” an earlier, compensable injury. See, e.g., Leadbetter, Inc. v. Penkalski, 21 Va.App. 427, 432, 464 S.E.2d 554, 556 (1995) (“[W]here ... the chain of causation from the original industrial injury to the condition for which compensation is sought is direct, and not interrupted by any intervening cause attributable to the [employee’s] own intentional conduct, then the subsequent [condition] should be compensable.” (internal quotations omitted)). The doctrine of compensable consequences, therefore, deals not with the causal relationship between a termination and an injury, but rather, the causal relationship between an earlier injury and a subsequent injury. In contrast, the termination for cause doctrine applies when the claimant asserts that he was terminated because of his earlier, compensable injury. These are, therefore, entirely separate inquiries: One focuses on whether the claimant’s termination was “attributable to” a prior compensable injury, and the other focuses on whether the claimant’s injury was “caused by” a prior compensable injury. Thus, the two doctrines cannot be intermingled — they deal with entirely separate circumstances and entirely separate rules of law.
Second, Estate of Ball involved the reconciliation of the statutory language “willful misconduct or intentional self-inflicted injury” contained in Code § 65.2-306(A)(1) with eases involving suicide. There is no issue of statutory construe *91 tion — or suicide — involved in this ease. And third, Estate of Ball affirmed the commission’s award of benefits, finding that credible evidence supported the commission’s determination that the decedent’s death was causally related to his injury. Here, in contrast, the commission denied Artis’ claim of benefits, so we must affirm the commission’s decision as long as there is credible evidence in the record supporting the commission’s finding that Artis’ termination was not attributable to his compensable injury.
In sum, there is ample evidence in the record supporting the commission’s conclusion that Artis was fired because of his misconduct, not because of his disability. Thus, we affirm the commission’s conclusion that Artis’ termination was not attributable to his disability.
B. Whether Artis Was “Responsible” for His Misconduct
In determining whether the claimant was “responsible” for his wrongful act, the crucial determination is whether the claimant’s misconduct was voluntary or involuntary. A disabled employee who engages in voluntary misconduct is deemed to have constructively refused an offer of selective employment, thereby justifying a forfeiture of benefits. See, e.g., Porter v. Ford Motor Co., 109 Mich.App. 728, 311 N.W.2d 458, 460 (1981) (“A disabled employee who can perform that favored work, yet violates company rules to the extent that discharge is justified, in actuality is refusing to perform the favored work[,][ ] thus creating a bar to compensation____”); see also Richmond Cold Storage Co. v. Burton, 1 Va.App. 106, 111, 335 S.E.2d 847, 850 (1985) (noting that “an employee is guilty of ‘misconduct connected with his work’ when he deliberately violates a company rule” (emphasis in original)). In contrast, conduct that is involuntary does not justify a forfeiture of benefits because it is, by its very nature, beyond the employee’s control and, therefore, not equivalent to a constructive refusal of selective employment. See, e.g., Reese, 24 Va.App. at 338, 482 S.E.2d at 98 (noting that, in Eppling, “we held that the claimant’s excessive absenteeism caused by a non-work-related injury beyond the employee’s control was not *92 the type of wrongful act which, upon termination, justified a forfeiture of workers’ compensation benefits” (emphasis added)).
Under the circumstances of this case, there is credible evidence in the record supporting the commission’s decision that Artis “was responsible for his wrongful actions on June 29, 2000.” Although Dr. Harris opined that Artis’ conduct was caused by his PTSD, there is no evidence that this “causal relationship” affected Artis to such an extent that his actions were “beyond [his] control.” Reese, 24 Va.App. at 338-39, 482 S.E.2d at 97-98. Although Artis did offer proof that his accident resulted in a compensable psychiatric disorder, the evidence did not indicate that his mental state had deteriorated to the point that he was no longer able to control his actions. In fact, Artis himself testified that he acted with premeditation, and with knowledge of his actions and the consequences of those actions. Thus, credible evidence in the record supports the commission’s determination that Artis was responsible for his voluntary misconduct.
Artis contends that our decision in Timbrook v. O’Sullivan Corp., 17 Va.App. 594, 439 S.E.2d 873 (1994), mandates a different result. In TimbrooJc,
[we] held that the Murphy forfeiture rule does not apply to an employee who was discharged for failing to notify her employer that she would be absent from selective employment that she had refused. Because the employee had refused, or not accepted, the employer’s offer of selective employment, her termination following three consecutive absences was “not for cause or for misconduct, as in Murphy, [which would] justify a forfeiture of her compensation benefits that could never be cured.” [Timbrook, 17 Va.App. at 598, 439 S.E.2d at 876].
Eppling, 18 Va.App. at 129-30, 442 S.E.2d at 222 (discussing Timbrook, 17 Va.App. at 598, 439 S.E.2d at 876) (emphasis added). Unlike the claimant in TimbrooJc, Artis accepted employer’s offer of selective employment. Thus, TimbrooJc is inapplicable here.
*93 As noted by the deputy commissioner, “[t]o the extent [Artis] then felt pressured by the employer to resume his normal work activities, ... [he] had various other options available to him other than feigning a robbery so that he might attempt a murder.” Thus, because Artis’ misconduct was purely voluntary in nature, the commission did not err in determining that Artis’ termination for cause justified a forfeiture of benefits.
III. CONCLUSION
Accordingly, the commission correctly determined that Artis was terminated, not for reasons attributable to his injury or its residual effects, but for misconduct for which he was fully “responsible.” Although we certainly do not condone the insensitive manner in which employer apparently treated Artis following his industrial accident, the reprehensibility of employer’s conduct is not at issue here. Rather, we are constrained to deciding the issue of whether credible evidence supports the commission’s determination that Artis’ termination was attributable to his volitional misconduct rather than his disability. Here, because the record supports the commission’s determination that employer did not terminate Artis because of his injury or its “residual effects,” but rather, because of his voluntary, criminal acts, we affirm the commission’s denial of post-termination partial disability benefits.

Affirmed.

. In construing Murphy and Watson, we note that we have used inconsistent and potentially confusing language when discussing this aspect of the forfeiture rule. For example, we have questioned whether the claimant's dismissal was "concerning,” Richfood Inc. v. Williams, 20 Va.App. 404, 408, 457 S.E.2d 417, 419 (1995); Timbrook v. O’Sullivan Corp., 17 Va.App. 594, 597, 439 S.E.2d 873, 875 (1994), "related to,” Williams, 20 Va.App. at 409, 457 S.E.2d at 419; Timbrook, 17 Va.App. at 595, 439 S.E.2d at 874, "caused by," Reese, 24 Va.App. at 338, 482 S.E.2d at 97; Eppling, 18 Va.App. at 130, 442 S.E.2d at 222, "as a result of,” Watson, 219 Va. at 833, 252 S.E.2d at 313, "attributable to,” Eppling, 18 Va.App, at 129, 442 S.E.2d at 222, "as a consequence of,” Williams, 20 Va.App. at 406, 457 S.E.2d at 418; Eppling, 18 Va.App. at 130, 442 S.E.2d at 222, "due to,” Williams, 20 Va.App. at 405, 457 S.E.2d at 417; Eppling, 18 Va.App. at 129, 442 S.E.2d at 222, or "causally related to,” Reese, 24 Va.App. at 330, 482 S.E.2d at 93, his compensable disability. Each of these phrases has a slightly different import. But regardless of which language is employed, the underlying focus is the same: Was the claimant fired because of his disability, or was he fired for another reason entirely? See, e.g., Marval Poultry Co. v. Johnson, 224 Va. 597, 601, 299 S.E.2d 343, 345 (1983) (holding that claimant was not entitled to post-termination disability benefits where *86 "there is nothing in the record from which it may reasonably be inferred that [the claimant] was dismissed because of his [disability]” rather than his dishonesty (emphasis added)).

. So, for example, if a claimant hurts his back, and — because of the pain — becomes an alcoholic, and is later fired because he appears for work in an inebriated state, he cannot then claim that his termination was "attributable to" his disability even though there is an attenuated chain of causation between the disability and the misconduct that caused his termination. In contrast, if that same claimant hurts his back, and is fired because he is no longer able to perform his duties, this more immediate nexus would suffice to show that his termination was “attributable to” his disability.

. We also note that this is not a case where the commission was required to accept the "uncontradicted medical evidence” of one of the parties. Artis’ only evidence that his misconduct was directly related to his disability was the opinion of his psychologist. Because a licensed psychologist is not a medical doctor, a psychologist’s opinion is not actually "medical" evidence. Cf. John v. Im, 263 Va. 315, 321, 559 S.E.2d 694, 697 (2002) (noting that an expert witness "was a licensed psychologist, not a medical doctor”). Said differently, although a psychologist may certainly be qualified to render an expert opinion, an expert opinion is not necessarily equivalent to a medical opinion.

. Code § 65.2-306(A) provides that ”[n]o compensation shall be awarded to the employee or his dependents for an injury or death caused by (1) The employee’s willful misconduct or intentional self-inflicted injury....”