COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges O'Brien, Causey and Friedman
Argued at Norfolk, Virginia


DARRYL JENKINS

                                                    MEMORANDUM OPINION* BY
v.       Record No. 0381-22-1                   JUDGE MARY GRACE O'BRIEN
                                                      FEBRUARY 14, 2023
C & T DURHAM TRUCKING CO., INC. AND
  ACCIDENT FUND INS CO OF AMERICA


                FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

                Stephen F. Forbes (Forbes & Broadwell, on briefs), for appellant.

                Nirav Patel (Franklin & Prokopik, P.C., on brief), for appellees.


        Darryl Jenkins appeals a decision of the Workers' Compensation Commission denying the

portion of his claim seeking benefits for a traumatic brain injury, left hip injury, and lower back

injury.  Jenkins argues that the Commission erred by admitting the opinion of a psychologist

regarding the causation of his claimed brain injury.  Jenkins also contends the Commission erred by

finding that medical treatments for his claimed brain, hip, and lower back injuries were not causally

related to his work accident.  For the following reasons, we affirm.

                                    BACKGROUND

        "On appeal from a decision of the Workers' Compensation Commission, the evidence

and all reasonable inferences that may be drawn from that evidence are viewed in the light most

favorable to the party prevailing below." *Anderson v. Anderson*, 65 Va. App. 354, 361 (2015)

(quoting *Artis v. Ottenberg's Bakers, Inc.*, 45 Va. App. 72, 83 (2005) (en banc)).

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

In the afternoon of May 20, 2019, Jenkins rear-ended a vehicle while driving a tractor trailer for his employer, C & T Durham Trucking Co., Inc. (C & T Trucking). At a hearing on Jenkins's claim for workers' compensation benefits, a police officer testified that he found Jenkins outside the tractor trailer's cab when he arrived at the scene. The officer, who was not the first responder, testified that he did not know Jenkins's condition before arriving but later spoke to him in an ambulance and found that he "appeared with it, cognitive, clearly speaking to me about what had happened." The officer did not recall observing bleeding or any specific injuries, although he remembered seeing EMTs treat Jenkins. The ambulance transported Jenkins to the hospital where he was "awake, alert, and oriented" upon transfer. The ambulance records indicate that Jenkins "complain[ed] of left flank and abdominal pain" and "believe[d] it may have been caused by impacting the steering wheel during the crash." Further, according to the ambulance records, Jenkins "report[ed] remaining awake throughout the event with no reported loss of consciousness."

At the hospital, Jenkins advised medical providers that the accident occurred when he "hit another tractor trailer at 60 mph" and that he was wearing a seatbelt and the airbags did not deploy. Jenkins reported "severe" chest and abdominal pain but "denie[d] loss of consciousness and denie[d] altered level of consciousness." He did not report any "specific head or neck complaints." X-rays demonstrated that Jenkins sustained a "[f]racture of the anterior left ninth rib." A CT scan of Jenkins's brain showed "no acute intracranial hemorrhage, midline shift, mass effect[,] or extra-axial fluid collection" and that "[t]he skull base and calvarium are intact." However, the scan showed "chronic microvascular ischemia."

Approximately one week later, Jenkins sought follow-up treatment at In and Out Express Care, complaining of pain in his abdomen, mid-chest, and ribs. Describing the work accident, Jenkins reported that he was "trapped behind the dashboard that was pushed in [and] was

- 2 -

extricated by a state trooper." In addition to the rib fracture already identified at the hospital, Jenkins was diagnosed with contusions to the thorax and abdominal wall. Jenkins returned to In and Out Express Care on three more occasions, reporting pain in his ribs and stomach, but was released from care on June 14, 2019, with a note that he was "expected to attain full resolution in 60 days."

Also on June 14, Jenkins began seeing an orthopedic specialist, Dr. Robert Snyder. Jenkins reported continued "pain along the rib cage more anteriorly." Dr. Snyder referred Jenkins to physical therapy to address his "[l]eft rib cage pain with history of rib fracture." Jenkins returned to Dr. Snyder three weeks later, after attending four physical therapy sessions, and reported that he was still experiencing pain "along the left side at the lower portion of the rib cage in the midportion." Dr. Snyder kept Jenkins out of work for three additional weeks effective July 9, 2019, "unless there [was] sedentary duty available for him."

At a follow-up appointment with Dr. Snyder on August 1, 2019, Jenkins reported pain extending into "the hip area on the left" for the first time. Dr. Snyder noted that Jenkins's rib fracture was healing and there were "contusions and bruising involving the left side of the chest and the hip area." Jenkins returned to Dr. Snyder on September 3, 2019, having finished physical therapy. Dr. Snyder noted that Jenkins still had pain in "both the left and right rib areas," but the medical record from that date makes no mention of any hip pain. Dr. Snyder noted an ongoing diagnosis of "[h]ealed rib fractures[,] contusions[,] bruising" and released Jenkins to full-duty work with no restrictions effective September 9, 2019.

At another appointment on October 8, 2019, Jenkins advised Dr. Snyder that he had "not yet returned to work" and could not "stand for long periods of time without experiencing lower back and left hip pain." This is the first instance of Jenkins reporting pain in his lower back. In the medical record, Dr. Snyder reiterated that the rib fracture had healed and Jenkins was

released to full-duty work. Dr. Snyder added that "[s]hould [Jenkins] feel that he has other injuries resulting from the accident, he will need to bring these to the attention of his Worker[s'] Comp case manager."

Jenkins saw Dr. Snyder again three months later and had still not returned to work. Jenkins reported that he could not walk and had "pain in both hips as well as in the left and right chest wall." Dr. Snyder recommended a CT scan of the chest wall and prescribed pain medication but explained that he could not address Jenkins's other complaints "unless they [were] included under his Worker[s'] Comp plan." The recommended CT scan demonstrated "[n]o acute rib fractures" and "[n]o significant abnormality in the chest." After reviewing the CT scan, Dr. Snyder determined that Jenkins had reached maximum medical improvement, "need[ed] no further follow[-]up," and "d[id] not require any permanent limitations" on his capacity to work. On February 17, 2020, Dr. Snyder completed a medical questionnaire, indicating that he did not believe Jenkins's claimed left hip injury was causally related to the work accident.

At a medical evaluation with the Department of Veterans Affairs on February 24, 2020, Jenkins reported, for the first time, having suffered a concussion and loss of consciousness in the May 2019 work accident. Jenkins also complained of hip and lower back pain, and radiology findings showed early degenerative hip changes and "[m]ild L5-SI facet disease."

Dr. Garrett Kelly, a family and sports medicine practitioner, examined Jenkins on March 26, 2020. Jenkins also conveyed to Dr. Kelly that he had lost consciousness in the work accident and awoke in the truck with "glass cuts." He reported pain in his left hip and lower back. In a subsequent medical questionnaire, Dr. Kelly concluded that the work accident caused Jenkins's hip pain because, after examining Jenkins and reviewing his medical history, Dr. Kelly found "no known pre-existing cause and no known post-accident cause" and "no indication of

malingering or symptom magnification." Dr. Kelly did not elaborate on the cause of Jenkins's claimed lower back pain and acknowledged that "further diagnostic testing, including an MRI, is warranted."

Dr. Kelly also found that Jenkins "exhibit[ed] signs and symptoms of traumatic brain [injury] during [the] clinical evaluation" and referred Jenkins to a concussion clinic for an evaluation by Dr. Edward Walko, a specialist in physical medicine and rehabilitation.

At an evaluation on April 8, 2020, Jenkins told Dr. Walko that he experienced "daily headaches on the left side of his head" ever since his work accident. Jenkins also reported difficulty with memory, blurred vision, and irritability. Jenkins's wife attended the appointment and said that Jenkins was "not the same person since the accident." Jenkins also stated that he continued to have pain in his ribs "as well as pain in the neck and upper back and also the lower back." In a later questionnaire, Dr. Walko concluded, after examining Jenkins and reviewing his medical history, that Jenkins experienced "no prior brain injury of any kind before [the work accident] and ha[d] no history of memory loss or dementia." Dr. Walko agreed that "[b]y history and after a review of medical records, [Jenkins] lost consciousness at the scene of the accident" and opined that Jenkins's reported symptoms were consistent with a traumatic brain injury, closed-head injury, and concussion. Dr. Walko referred Jenkins to Dr. Gregory O'Shanick, a neurology and psychiatry specialist, to address "significant and long-term problems from [Jenkins's] brain injury."

A nurse at Dr. O'Shanick's office evaluated Jenkins for "complaints associated with a work-related semi-truck accident that occurred on May 20, 2019" and noted that he reported "[d]ifficulty sleeping, fatigue, headache, generalized pain, memory changes, vision changes, hearing changes, decreased motivation, and imbalance." The nurse's "diagnostic impressions"

included a concussion and post-traumatic headaches "secondary to" his May 2019 work accident.

About two months after the nurse's evaluation, on July 9, 2020, Jenkins saw orthopedist Dr. John Burrow and complained of pain in his left lower extremity and left hip. Jenkins reported "no relevant past medical/surgical history" on this date. Diagnostic tests of the lumbar spine revealed "underlying mild arthritic change at the posterior facets as well as degenerative change of the disc at L3-4, L4-5[,] and L5-S1." The tests also showed evidence of "mild arthritic change of the hips bilaterally." Dr. Burrow administered an injection to address Jenkins's pain and recommended an MRI, which showed degenerative disc disease and degenerative joint disease in the lower back.

An August 2020 MRI of Jenkins's brain revealed "[n]o acute intracranial process" but detected "[m]ild white matter disease likely related to chronic small vessel ischemic changes." An MRI of the left hip, also performed in August 2020, showed "[m]ild degenerative changes," including a "possible small tear [of the labrum]."

On July 14, 2020, Dr. Snyder completed another medical questionnaire for C & T Trucking, repeating his opinion that he did not believe Jenkins's claimed left hip injury was causally related to the work accident. Dr. Snyder also opined that Jenkins was capable of returning to full-duty employment without restrictions related to his healed rib fracture stemming from the work accident.

Nevertheless, on August 25, 2020, the nurse from Dr. O'Shanick's office submitted a report reiterating her diagnostic impressions from Jenkins's initial evaluation, including her conclusion that Jenkins suffered from a concussion and post-traumatic headache due to the work accident. She recommended that Jenkins remain out of work due to his ongoing symptoms.

Next, in December 2020, Jenkins began seeing orthopedist Dr. Lawrence Shall for lower back and left hip pain, reporting that the pain began with the work accident. Dr. Shall noted that the diagnostic imaging for the left hip showed "[n]ormal findings for age" and recommended an injection to treat Jenkins's left hip pain.

Orthopedist Dr. John Aldridge performed an independent medical evaluation (IME) on behalf of C & T Trucking in January 2021. After examining Jenkins and reviewing his medical history, Dr. Aldridge opined that Jenkins suffered from "[o]steoarthritis of the left hip." Dr. Aldridge highlighted Dr. Snyder's medical opinions, medical records through August 1, 2019 (when Jenkins first reported hip pain), and MRI findings showing osteoarthritis in Jenkins's left hip, and he stated that the objective medical evidence indicated "no complaints, no physical exam findings, or anything to indicate a hip injury" related to Jenkins's work accident.

Dr. Jack Spector, a neuropsychologist, also performed an evaluation of Jenkins on behalf of C & T Trucking. Dr. Spector opined that Jenkins's "subjective complaints, clinical presentation, and wide-ranging and severe impairments during testing are all suggestive of a more severe neurologic disorder than could have reasonably been caused by the mild head injury he sustained in his May 2019 accident." Although Dr. Spector acknowledged that Jenkins exhibited "signs of symptom exaggeration, magnification, [and] malingering," he did not conclude that Jenkins was feigning impairment; however, he indicated that he would reconsider that assessment if dementia specialists were to rule out neurologic conditions.

Jenkins retained Dr. Richard Frederick, a psychologist specializing in assessment tools, to review Dr. Spector's report and provide a rebuttal opinion. Dr. Frederick critiqued Dr. Spector's methodology for assessing malingering and concluded "[i]t is absolutely false that if [Jenkins] is demonstrated not to have severe impairment, then he must be faking."

Neurologist Dr. O'Shanick submitted a report noting that Jenkins had been under his office's care since April 2020 for injuries stemming from the work accident. Dr. O'Shanick opined that Jenkins was still not medically cleared to return to work due to his "neuromedical deficits." He also briefly responded to Dr. Spector's report and critiqued the reliability of psychological assessments in general.

Jenkins filed claims for temporary total disability benefits from September 10, 2019 and continuing and for a lifetime medical award for injuries specified as "head, concussion, traumatic brain injury, back, left hip and bilateral . . . ribs." At the evidentiary hearing, the parties stipulated that Jenkins sustained a compensable injury to his bilateral ribs while earning a pre-injury average weekly wage of $566.67. C & T Trucking denied the compensability and causation of Jenkins's claimed head, back, and hip injuries.

Jenkins's daughter testified at the hearing, stating that she had visited Jenkins at the hospital following the work accident and observed "cuts on his face." When Jenkins came home from the hospital, he was "in a lot of pain" and required assistance to reach his second-floor condominium. At her wedding several days after the accident, she had to support Jenkins "a lot" as they walked down the aisle. She also testified about several occasions after the accident when Jenkins "got lost" or forgot to pick up her son from school.

Jenkins's wife also testified. She stated that she observed her husband at the hospital with "glass all over him" and hospital staff "picking shards of glass . . . out of his skin." Jenkins's wife described how he had changed after the accident: he no longer paid household bills on time, had problems with memory, and needed his wife to drive him to medical appointments. Jenkins's wife also noted a change in his demeanor, stating that "he was just out of it, he wasn't there." On cross-examination, she denied that Jenkins had any difficulty sleeping or complained of depression or anxiety before the accident.

In his own hearing testimony, Jenkins stated that he remembered "the steering wheel and the front glass coming toward [him]" during the accident. According to Jenkins, his rib hit the steering wheel, and the glass from the windshield hit his head. He denied having regular headaches before the accident and stated that he had been using a cane "[e]ver since the accident" to help take the weight off his left hip. On cross-examination, Jenkins said he was truthful to the EMTs at the scene and to the doctors at the hospital on the date of the accident.

After reviewing the evidence and testimony, the deputy commissioner held that Jenkins failed to carry his burden of proving that his claimed head, back, and hip injuries were causally related to the work accident. The deputy commissioner reasoned that "none of the medical records proximate to the accident reference any complaints or diagnoses relative to the back, left hip, or head." Acknowledging that several medical providers later in the claim attributed Jenkins's various complaints to the work accident, the deputy commissioner found that those opinions were "based on an incomplete and inaccurate history."

Jenkins sought review by the full Commission, assigning error to the deputy commissioner's finding that his head, back, and hip injuries were not causally related to the work accident. Jenkins also asserted that the deputy commissioner erred by admitting the report of neuropsychologist Dr. Spector, which Jenkins had previously moved to exclude.

The Commission unanimously affirmed, finding that the deputy commissioner did not rely on Dr. Spector's opinion to deny compensability for Jenkins's disputed injuries. The Commission agreed with the deputy commissioner's assessment that Jenkins failed to carry his burden of proof based on "the reports of the initial treating health care providers in comparison to the later opinions formed upon incomplete or inaccurate histories." This appeal followed.

ANALYSIS

Decisions of the Commission "shall be conclusive and binding as to all questions of fact." Code § 65.2-706(A). Appellate courts "do not retry the facts before the Commission nor do we review the weight, preponderance of the evidence, or the credibility of witnesses." *Jeffreys v. Uninsured Employer's Fund*, 297 Va. 82, 87 (2019) (quoting *Caskey v. Dan River Mills, Inc.*, 225 Va. 405, 411 (1983)). "Rather, we are bound by the [C]ommission's findings of fact as long as 'there was credible evidence presented such that a reasonable mind *could* conclude that the fact in issue was proved,' even if there is evidence in the record that would support a contrary finding." *Artis*, 45 Va. App. at 83-84 (quoting *Westmoreland Coal Co. v. Campbell*, 7 Va. App. 217, 222 (1988)). The scope of judicial review of the Commission's fact-finding function is "severely limited, partly in deference to the agency's expertise in a specialized field." *Roske v. Culbertson Co.*, 62 Va. App. 512, 517 (2013) (quoting *Southside Va. Training Ctr. v. Ellis*, 33 Va. App. 824, 828 (2000)). "However, the [C]ommission's legal determinations are not binding on appeal and will be reviewed *de novo*." *Id.* (quoting *Wainwright v. Newport News Shipbuilding & Dry Dock Co.*, 50 Va. App. 421, 430 (2007)).

## I. Dr. Spector's Opinion

Jenkins first argues the Commission erred by admitting Dr. Spector's report opining that Jenkins suffers from a "more severe neurologic disorder than could have reasonably been caused by the mild head injury he sustained in his May 2019 accident." Relying on *John v. Im*, 263 Va. 315 (2002), Jenkins argues that as a psychologist Dr. Spector was not qualified to state an expert opinion regarding the diagnosis or cause of a physical brain injury and the Commission "ignored the longstanding evidentiary rule promulgated by the Supreme Court of Virginia."[1]

---

[1] Jenkins did not waive his objection to Dr. Spector's opinion by offering the rebuttal opinion of Dr. Frederick, also a psychologist. Generally, "when a litigant 'unsuccessfully objects to evidence that he considers improper and then introduces on his own behalf evidence of

- 10 -

In general, "[t]he question whether a witness is qualified to testify as an expert is largely within the sound discretion" of the lower tribunal, and therefore an appellate court will only reverse such a decision if it constitutes an abuse of that discretion. *Jackson v. Qureshi*, 277 Va. 114, 121 (2009) (quoting *Lloyd v. Kime*, 275 Va. 98, 108 (2008)); *see also Lynchburg Foundry v. Tune*, 1 Va. App. 295, 299 (1986) (adopting abuse of discretion standard for review of Commission decisions regarding qualifications of experts). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Dunnavant v. Newman Tire Co.*, 51 Va. App. 252, 260 (2008) (quoting *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006)). "This highly deferential standard of review 'necessarily implies that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts—yet remain entirely reasonable.'" *Reston Hosp. Ctr., LLC v. Remley*, 63 Va. App. 755, 764 (2014) (quoting *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013)). Further, to the extent the issue involves the Commission's interpretation of its own rules, we review the Commission's action deferentially and reverse only if its action is arbitrary or capricious. *Jenkins v. Webb*, 52 Va. App. 206, 211 (2008).

First, we acknowledge Jenkins is correct that, in *John v. Im*, the Supreme Court held that a licensed psychologist is not qualified to state an expert medical opinion regarding the diagnosis or cause of a physical brain injury. 263 Va. at 321. In *John*, a tort liability case arising from a

---

the same character, he waives his earlier objection to the admission of that evidence.'" *Isaac v. Commonwealth*, 58 Va. App. 255, 260 (2011) (quoting *Combs v. Norfolk & W. Ry.*, 256 Va. 490, 499 (1998)); *see Stevens v. Commonwealth*, 72 Va. App. 546, 557-58 (2020) (applying waiver in the context of expert opinions). Here, however, Dr. Frederick's report was not of the "same character" as Dr. Spector's causation opinion. Instead, Dr. Frederick opined on the reliability of the methods Dr. Spector used to evaluate whether Jenkins was feigning impairment and critiqued any conclusion that Jenkins was faking—a conclusion Dr. Spector did not even reach. Dr. Frederick did not address the gravamen of Dr. Spector's opinion that Jenkins's cognitive impairment is unrelated to any head injury sustained in the May 2019 work accident, and he did not affirmatively give a medical causation opinion of his own.

car accident, the Court affirmed the exclusion of a psychologist's opinion that the plaintiff sustained a "mild traumatic brain injury . . . as a result of the impact and the sudden acceleration-deceleration of her head" in the accident. *Id.* at 318, 320. The Court reasoned that an "opinion concerning the causation of a particular physical human injury is a component of a diagnosis, which is part of the practice of medicine" and because a psychologist is "not a medical doctor, . . . he [is] not qualified to state an expert medical opinion regarding the cause of [an] injury." *Id.* at 322.

However, pursuant to its own rules, the Commission "is not bound by statutory or common law rules of pleading or evidence nor by technical rules of practice." Va. Workers' Comp. Comm'n Rule 2.2; *see Jenkins v. Webb*, 47 Va. App. 404, 408-09 (2006). We have stated that "the [C]omission is not bound by common law rules of evidence, but may adopt whatever procedures it sees fit so long as they 'protect the substantial rights of the parties.'" *Ceres Marine Terminals v. Armstrong*, 59 Va. App. 694, 702 (2012) (quoting *Rios v. Ryan Inc. Cent.*, 35 Va. App. 40, 45 (2001)). The Commission thus has wide latitude in determining whether to admit an expert opinion in an individual case.

Given this wide latitude, the Commission did not abuse its discretion by admitting Dr. Spector's report into the record.[2] The Commission was not bound by the evidentiary rule enunciated in *John* as long as the Commission protected the parties' substantial rights, which occurred here. There is no dispute on appeal that Jenkins received Dr. Spector's report and raw data and had adequate time to review the information with his medical experts and retain psychologist Dr. Frederick to produce a rebuttal opinion. *Cf. Rios*, 35 Va. App. at 44-45

---

[2] The Commission's wide latitude is also illustrated by its admission of, without objection, a nurse's "diagnostic impression" that Jenkins suffered a concussion in the work accident.

(affirming admission of hearsay evidence where Commission observed sufficient procedural rights).[3]

Additionally, and more significantly, we find no abuse of discretion because the record is clear that the Commission did not rely on Dr. Spector's causation opinion in reaching its conclusion to deny benefits for Jenkins's claimed traumatic brain injury. Despite referencing Dr. Spector's report in the summary of the evidence, the deputy commissioner did not mention it again when analyzing the issues and drawing a conclusion. Instead, as discussed in more detail below, the deputy commissioner denied benefits because no complaint of head injury or loss of consciousness appeared in any of the medical reports proximate to the work accident. On review, the full Commission expressly found that "the lower decision did not rely upon Dr. Spector's opinion" and agreed with the deputy commissioner's assessment that Jenkins "failed to carry his burden of proof with the submitted medical record, i.e., the reports of the initial treating health care providers."

Furthermore, Dr. Spector's opinion was based on a premise rejected by the Commission. Dr. Spector assumed arguendo that Jenkins suffered at least a concussion in the work accident but concluded that this "mild head injury" could not have caused his severe cognitive impairment. The Commission, by contrast, found that Jenkins did not even prove a concussion or mild head injury in the accident. The disconnect between Dr. Spector's opinion and the rationale for denying benefits demonstrates that the Commission did not rely on Dr. Spector's opinion and therefore committed no reversible error by admitting it into the evidentiary record.

---

[3] We note that Dr. Spector was qualified to opine as to the results of his psychological testing and analysis, and a significant portion of his report was dedicated to that objective. *See Artis*, 45 Va. App. at 89 n.3 (stating that "a psychologist may certainly be qualified to render an expert opinion" on the diagnosis and treatment of mental disorders); *see also O'Rourke v. Vuturo*, 49 Va. App. 139, 152-53 (2006) (distinguishing *John* and allowing a mental health expert to testify in a child visitation case regarding a psychological, rather than a physical, injury).

## II. Causation of Brain, Hip, and Back Injuries

Jenkins also argues the Commission erred by finding that medical treatments for his claimed brain, hip, and lower back injuries were not causally related to his work accident. He asserts the Commission erred by finding that the opinions of Dr. O'Shanick, Dr. Walko, Dr. Kelly, and Dr. Shall rely on "incomplete or inaccurate histories." Jenkins maintains that he "more than met [his] burden" of establishing causation for his disputed injuries.

The Commission's determination of causation is a finding of fact. *Lee Cnty. Sch. Bd. v. Miller*, 38 Va. App. 253, 260 (2002). "[F]actual findings of the [C]ommission will not be disturbed if based on credible evidence." *Hess v. Va. State Police*, 68 Va. App. 190, 194 (2017) (quoting *Anthony v. Fairfax Cnty. Dep't of Fam. Servs.*, 36 Va. App. 98, 103 (2001)). To determine whether credible evidence supports the Commission's factual findings, "the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses." *Pruden v. Plasser Am. Corp.*, 45 Va. App. 566, 574-75 (2005) (quoting *Wagner Enters., Inc. v. Brooks*, 12 Va. App. 890, 894 (1991)). "[U]nlike the Commission, the reviewing court is not charged with determining anew whether the . . . evidence of causation should be accorded sufficient weight to constitute a preponderance of the evidence on that issue." *Bass v. City of Richmond Police Dep't*, 258 Va. 103, 114-15 (1999).

"Causation is usually proven by medical evidence." *Clinch Valley Med. Ctr. v. Hayes*, 34 Va. App. 183, 192 (2000). "The opinion of the treating physician is entitled to great weight, although the [C]ommission is not required to accept it[.]" *Vital Link, Inc. v. Hope*, 69 Va. App. 43, 64 (2018) (second alteration in original) (quoting *United Airlines, Inc. v. Hayes*, 58 Va. App. 220, 238 (2011)). A treating physician's opinion, however, is "not conclusive, especially when the opinion is not accompanied by any reasoning or explanation." *Thompson v. Brenco, Inc.*, 38

Va. App. 617, 623 (2002). "If there is any doubt in the treating physician's opinion, or if there is contrary expert medical opinion, 'the [C]ommission is free to adopt that which is most consistent with reason and justice.'" *United Airlines, Inc. v. Sabol*, 47 Va. App. 495, 501-02 (2006) (quoting *Williams v. Fuqua*, 199 Va. 709, 714 (1958)). Thus, where medical opinions conflict, "the [C]ommission [is] free to decide which evidence [is] more credible and should be weighed more heavily." *Thompson*, 38 Va. App. at 624.

### a. Traumatic Brain Injury

We agree with the Commission's decision that Jenkins failed to prove causation of his claimed traumatic brain injury. The record includes testimony from a police officer who responded to the scene of Jenkins's work accident. When the police officer spoke with Jenkins at the scene, Jenkins "appeared with it, cognitive, clearly speaking . . . about what had happened." According to ambulance records, Jenkins "complain[ed] of left flank and abdominal pain . . . caused by impacting the steering wheel during the crash" and "report[ed] remaining awake throughout the event with no reported loss of consciousness." There is no mention of a loss of consciousness in these initial records.

Once Jenkins arrived at the hospital, he complained of "severe" pain in the chest and abdominal area but again "denied loss of consciousness and deni[ed] altered level of consciousness." A brain CT scan found no acute intracranial hemorrhage. The record indicates that there was no report of "specific head or neck complaints" at the hospital. When Jenkins followed up at In and Out Express Care between May 28 and June 14, 2019, diagnoses were limited contusions of the thorax and abdominal wall.

In fact, it was not until February 24, 2020, at an evaluation with the Department of Veterans Affairs, that Jenkins first mentioned suffering a concussion and loss of consciousness in the work accident. He never reported symptoms of traumatic brain injury to Dr. Snyder, with

- 15 -

whom he actively treated during those nine months between the accident and the VA evaluation. Later, on March 26, 2020, Jenkins also told Dr. Kelly that he lost consciousness in the work accident and subsequently reported the same to Dr. Walko and the nurse in Dr. O'Shanick's office. These reports directly contradict the responding police officer's hearing testimony, the medical records from the ambulance and hospital on the date of the work accident, and the medical records from In and Out Express Care. As the Commission specifically noted, any report of lost consciousness "was absent from any contemporaneous medical reports." Based on this record, we agree with the Commission's assessment that Jenkins "failed to carry his burden of proof with the submitted medical record, i.e., the reports of the initial treating health care providers in comparison to the later opinions formed upon incomplete or inaccurate histories."

We acknowledge the testimony of Jenkins's daughter and wife that Jenkins showed signs of memory loss, a change in demeanor, and depression and that these symptoms manifested after the work accident. Nonetheless, as the Commission noted, the mere contention that these conditions arose after the accident is not controlling. *See Bass*, 258 Va. at 114-15. Jenkins had the burden of proving to the Commission that his traumatic brain injury resulted from the work accident, and we are precluded from "determining anew" whether his causation evidence "should be accorded sufficient weight to constitute a preponderance." *Id.* We hold that the Commission properly weighed the objective medical evidence and properly considered the questionable history offered by Jenkins to his medical providers. Therefore, we find no basis to overturn the Commission's factual finding that Jenkins failed to carry his burden of proving that he suffered a traumatic brain injury causally related to the May 20, 2019 work accident. *See Pruden*, 45 Va. App. at 576 (noting that the Commission's determination of causation is a factual finding and will not be disturbed on appeal if there is credible evidence to support the finding).

### b. Left Hip and Lower Back

We also agree with the Commission's decision that Jenkins failed to prove causation of his claimed left hip and lower back injuries. Jenkins began treating with his orthopedic specialist, Dr. Snyder, on June 14, 2019. No report of hip pain is mentioned until August 1, 2019, when Dr. Snyder first noted that Jenkins had "contusions and bruising involving the left side of the chest and the hip area." This also was the first instance that Jenkins reported pain extending into "the hip area on the left." Dr. Snyder released Jenkins to full-duty work with no restrictions effective September 9, 2019.

Approximately two months later, Jenkins reported to Dr. Snyder that he could not "stand for long periods of time without experiencing lower back and left hip pain." This was the first time Jenkins reported pain symptoms in his lower back. At no point did Dr. Snyder, as the treating orthopedic physician, relate Jenkins's lower back pain or left hip pain to the work accident. In fact, back on February 17, 2020 and again on July 14, 2020, Dr. Snyder completed medical questionnaires indicating that he did not believe Jenkins's left hip was causally related to the work accident. Dr. Snyder did not elaborate on the lower back.

When Jenkins saw orthopedist Dr. Burrow on July 9, 2020, he complained of pain in his left hip but reported "no relevant past medical/surgical history." Diagnostic tests performed on this date revealed arthritic and degenerative changes to the lower back and arthritic changes to the hips. A later MRI of Jenkins's lumbar spine demonstrated degenerative disc disease and degenerative joint disease at multiple levels of the lumbar spine, with no evidence of an acute injury. Dr. Aldridge, the orthopedist who conducted the IME, opined that Jenkins suffered from left-hip osteoarthritis. He highlighted the opinions of Dr. Snyder, as well as medical records through August 1, 2019 and MRI findings, in reaching the conclusion that there was no evidence of a hip injury related to Jenkins's work accident.

Based on the above medical opinions and objective evidence, we find no basis to overturn the Commission's finding that Jenkins failed to carry his burden of proving any injury to his left hip and lower back that is causally related to the work accident; there was more than sufficient, credible evidence to support that finding.  *See Pruden*, 45 Va. App. at 576.

CONCLUSION

For the foregoing reasons, we affirm the decision of the Commission.

*Affirmed.*